**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Anthony J. DICHIARINTE, Defendant-Appellant.**

**No. 17383.**

United States Court of Appeals,
Seventh Circuit.

June 4, 1971.

Stevens, Circuit Judge, dissented and filed opinion.

Raymond J. Smith, Chicago, Ill., for defendant-appellant.

William J. Bauer, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., of counsel.

Before SWYGERT, Chief Judge, and PELL and STEVENS, Circuit Judges.

SWYGERT, Chief Judge.

Defendant, Anthony J. Dichiarinte, appeals from his conviction of two counts of wilful tax evasion in violation of 26 U.S.C. § 7201. In an indictment returned April 14, 1964, the Government charged defendant with attempting to evade income taxes totaling approximately $20,000 for the years 1957 and 1958 by failing to file returns and by concealing his true income. Defendant was found guilty by a jury in October 1968 and was sentenced to consecutive terms totaling nine years and fined $10,000. We reverse.

I

Defendant's primary contention is that his conviction rests, in large part, on evidence derived from items seized during an unconstitutional search of his home. The district court held hearings on defendant's motions to suppress this

evidence on October 30 and November 2, 1964, and on June 24, 1968. The court subsequently denied the motions and entered findings of fact, conclusions of law, and a memorandum opinion holding that the challenged items were legally seized pursuant to a valid consent search. We rule that the district court erred in denying these motions to suppress.

The facts relating to the search follow. On March 9, 1960, a warrant was issued for the arrest of the defendant on an indictment charging him with a sale of narcotics. That evening, two federal narcotic agents observed the defendant, his wife, and a friend, one Rosenthal, drive away from his home. The agents stopped defendant's car about a mile or two from his home. The agents, one of whom drew his gun, then ordered defendant and Rosenthal to get out of the car. After defendant was arrested and the two men were searched, they were taken to the agents' car. In response to the question whether he had any narcotics in his home, defendant replied, "I have never seen narcotics. You guys come over to the house and look, you are welcome to." The group then returned to defendant's home and the search was begun. A short time later, Rosenthal advised defendant that he did not have to permit the search. Defendant replied, "That is all right, I told them they could search. They are not going to find any narcotics in here."

After the search had been in progress for approximately forty-five minutes, one of the agents removed some currency exchange receipts from a drawer near the sofa on which defendant was seated. Rosenthal then stated, "Tony, they are going a little bit too far. If I were you I would stop the search. They are taking everything." According to the defendant, when he saw the agent seize the currency exchange receipts, he said, "Does that look like narcotics if that is what you want to search for?" and the agent replied, "Sorry, Pal, we are here now and this is what we are going to do." Shortly thereafter, defendant announced, "The search is over. I am calling off the search." However, the agents continued their search for about ten more minutes.

The record does not contain either the original seized documents or copies; however, we are informed by the parties in their briefs that these items included: currency exchange receipts for the purchase of money orders; insurance policies on defendant's and other persons' lives; insurance policies on cars, dwellings, and furs owned by defendant or members of his family; receipts for a loan; and a certificate of title to certain real estate. The documents were taken to the Bureau of Narcotics' offices for examination, and on March 16, 1960, they were photographed by an internal revenue agent.

As justification for the search of the defendant's home and the seizure of his papers, the Government relies on the defendant's statement that the agents could "come over to the house and look." For the purpose of our decision in this case, we may assume that this statement constituted a free and voluntary invitation to the agents;[1] and

1. The Government has the burden of proving that the defendant's "consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). The defendant argues that this burden was not met and that his statements were not a specific and unequivocal invitation, but were assertions that if the agents procured a search warrant and conducted a legal search they would not find narcotics. See Channel v. United States, 285 F.2d 217, 220 (9th Cir. 1960) ; Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649, 651 (1951).

While we do not rule on this issue, we should point out that consents to search are carefully examined for evidence of coercion or duress. This is particularly true in the absence of a written waiver or warnings concerning fourth amendment rights. See United States v. Nikrasch, 367 F.2d 740, 744 (7th Cir. 1966) ; Porter v. Ashmore, 298 F.Supp. 951, 955 (D.S.C. 1969), rev'd on other grounds, 421 F.2d 1186 (4th Cir. 1970), cert. denied, 402

we may also assume that the items taken were evidence of crime and subject to seizure.[2] Even if we assume that defendant consented to a search, the record shows that the consent was limited to a search for narcotics. The evidence at the suppression hearings contains repeated reference to the agents' interest in narcotics; and there was no indication that they desired to look for anything other than narcotics themselves. When defendant became aware that the agents were inspecting and seizing his personal papers, he attempted to call off the search. Under these circumstances, defendant's statement that the agents could "come over to the house and look" must be taken to mean at most that they might come and conduct only such a search as would be necessary to establish whether he had any narcotics. Government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search.

■ A consent search is reasonable only if kept within the bounds of the actual consent. Honig v. United States, 208 F.2d 916, 919 (8th Cir. 1953).[3] In

---

U.S. 981, 91 S.Ct. 1644, 29 L.Ed.2d 146 (1971) ; *cf.* United States v. Miller, 395 F.2d 116, 118 (7th Cir.), cert. denied, 393 U.S. 846, 89 S.Ct. 132, 21 L.Ed. 2d 117 (1968). *But see* Byrd v. Lane, 398 F.2d 750, 754–755 (7th Cir. 1968), cert. denied, 393 U.S. 1020, 89 S.Ct. 625, 21 L.Ed.2d 564 (1969) ; Gorman v. United States, 380 F.2d 158, 164 (1st Cir. 1967).

Courts have not looked with favor on the practice of substituting consent for the authorization of a search warrant. The Supreme Court, in Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), stated that "police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." This court, in United States v. Arrington, 215 F.2d 630, 637 (7th Cir. 1954), said:

> It is high time that courts place their stamp of disapproval upon this increasing practice of federal officers searching a home without a warrant on the theory of consent, particularly where no reason is shown why a search warrant was not obtained.

The Court of Appeals for the Sixth Circuit expressed a similar sentiment in Catalanotte v. United States, 208 F.2d 264, 268 (6th Cir. 1953):

> We have noted with disapproval the growing tendency on the part of police officers to be very quick on the trigger in construing—and acting upon their construction—a statement of some known offender as an invitation to search his premises.

2. The defendant contends that certain of the documents were not subject to seizure because: there did not exist, at the time of the search, the necessary "nexus * * * between the item to be seized

and criminal behavior," Warden v. Hayden, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967) ; there was not "probable cause * * * to believe that the evidence * * * [would] aid in a particular apprehension or conviction," *id.*; and the evidence did not bear "a reasonable relation to the purpose of the search," United States v. Cook, 432 F.2d 1093, 1104 (7th Cir. 1970), cert. denied 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed. 2d 535 (1971).

We agree that the mere suspicion or expectation that an item may prove incriminating to a defendant in some unknown way—even if subsequent examination discloses that the item is evidence of previously unsuspected criminal activity—is not sufficient justification for the item's seizure. However, our conclusion that the search conducted by the federal agents went beyond the scope of defendant's consent renders consideration of this alternative fourth amendment claim unnecessary. Accordingly, we have made no attempt to determine whether the federal agents had reason to believe that the particular items they seized from defendant's home were relevant to their narcotics investigation.

3. The Government complains that if we accept the defendant's argument, the limitations on officers' conduct under consent searches will be more stringent than under searches pursuant to a warrant. In our view, consent is a waiver of the right to demand that government agents obtain the authorization of a warrant to justify their search; and the need for a warrant is waived only to the extent granted by the defendant in his consent. A defendant's consent may limit the extent or scope of a warrantless search in the same way that the specifications of a warrant limit a search pursuant to that warrant. Both

the case before us the defendant's consent set the parameters of the agents' conduct at that which would reasonably be necessary to determine whether he had narcotics in his home. But the agents went beyond what was necessary to determine whether defendant had hidden narcotics among his personal papers; they read through those papers to determine whether they gave any hint that defendant was engaged in criminal activity. This was a greater intrusion into defendant's privacy than he had authorized and the fourth amendment requires that any evidence resulting from this invasion be suppressed.[4]

■ Our holding that the search was unreasonable because it went beyond the scope of defendant's consent would be the same if the agents had conducted the search under a search warrant which authorized the seizure of narcotics. Such a warrant would not have given the agents the power to read defendant's personal papers. *Cf.* Woo Lai Chun v. United States, 274 F.2d 708 (9th Cir. 1960). The concurring opinion of Mr. Justice Stewart in Stanley v. Georgia, 394 U.S. 557, 569, 89 S.Ct. 1243, 22 L. Ed.2d 542 (1969), is instructive on this point. In that case, state and federal officers gained admission to Stanley's house under a search warrant authorizing the seizure of equipment and records used in an illegal wagering business. In the course of their search, the officers came upon some moving picture film which they later viewed with Stanley's projector and seized because they considered it obscene. Justice Stewart conceded that the broad authorization of

the warrant in that case empowered the agents to search through the desk drawer where the film was found. But the film was not "contraband, criminal activity, or criminal evidence in plain view," 394 U.S. at 571, 89 S.Ct. at 1251; and since it was not within the items enumerated in the officers' warrant, they could not put up a projector and examine the film in the hope that it would give some evidence of previously unsuspected criminal behavior. As Justice Stewart said, 394 U.S. at 572, 89 S.Ct. at 1251:

> To condone what happened here is to invite a government official to use a seemingly precise and legal warrant only as a ticket to get into a man's home, and, once inside, to launch forth upon unconfined searches and indiscriminate seizures as if armed with all the unbridled and illegal power of a general warrant.

Similarly, the officers' use of defendant's limited consent as a ticket to get inside his home and conduct a general search cannot be allowed. The Government has failed to sustain the burden of showing that it acted within the scope of defendant's consent.

Of course, if the government agents acting within the parameters of defendant's consent had come upon contraband, fruits or instrumentalities of crime, or clear evidence of criminal behavior which was lying in plain view, they could have seized those items. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed. 2d 782 (1967). But even though the record is somewhat unclear, it appears that at least some of the items seized

limit the officers' activity by stipulating the areas into which they may look. Both may limit a search to certain areas or even to certain specified items within an area. *See* United States v. Hopps, 215 F.Supp. 734 (D.Md.1962), aff'd, 331 F.2d 332 (4th Cir.), cert. denied, 379 U.S. 820, 85 S.Ct. 39, 13 L.Ed.2d 31 (1964) ; People v. Schmoll, 383 Ill. 280, 48 N.E.2d 933 (1943). Thus if government agents obtain consent or a warrant to search for a stolen television set, they must limit their activity to that which is necessary to search for such an item ; they may not

rummage through private documents and personal papers.

4. The fact that the defendant submitted to a degree of intrusion upon his privacy by permitting the agents to enter his home and rummage through his personal property does not mean that the much greater intrusion on his privacy resulting from government agents' reading his personal papers must automatically be allowed. *See* Chimel v. California, 395 U.S. 752, 766–767 n. 12, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

and later used in the Government's tax evasion investigation were not in plain view but had to be opened and read. Even assuming that these items were evidence of crime and thus subject to seizure, their criminal character was not apparent on a mere surface inspection, and defendant's limited consent did not authorize the agents' opening and reading them.

Our conclusion that the search and seizure violated defendant's ·fourth amendment rights does not in itself establish that defendant's conviction must be reversed; we must also determine whether the Government used any of the seized items in building its case against defendant. The defendant was not harmed if neither the items seized nor their fruits were instrumental in securing his conviction. The question, as stated by the Supreme Court in Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

■ It does not appear that any of the seized documents themselves were in- · troduced in defendant's tax evasion trial; but the Government has made no attempt to argue that the documents would not taint the conviction if they were found to have been illegally seized. Indeed, the record shows that the Government made use of the documents in conducting its investigation.[5] Though in some situations it might be proper to remand for a determination by the district court the question whether illegally seized evidence tainted a conviction, cf. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), in this case we believe that the record adequately shows that the illegally seized items were instrumental in securing defendant's conviction. Accordingly, the judgment of conviction must be vacated. It may be that the Government has other evidence of defendant's tax evasion which is independent of, and in no way affected by, the illegal search. If so, it may retry defendant; but it must bear "the ultimate burden of persuasion to show that its evidence is untainted." *Alderman, supra,* at 183, 89 S.Ct. at 972.

## II

■ Defendant also contends that the trial court erred in failing to dismiss the indictment under Rule 48(b) of the Federal Rules of Criminal Procedure and under the sixth amendment for unnecessary and prejudicial preindictment and pretrial delay. Defendant's trial, under a 1964 indictment, required reconstruction of his income for the years 1957 and 1958 and did not take place until October 1968. Defendant contends that the Government had sufficient evidence to seek an indictment in 1962 but deliberately chose to delay for two years. Defendant argues, with some basis in the record, that one of the reasons for the delay was the Government's desire to utilize the district court's local rules to avoid having the case assigned to a particular district judge. The procedure which led to this alleged manipulation is described in our earlier opinion reversing this defendant's conviction for

---

5. At the June 24, 1968, hearing the following colloquy took place between the court and the assistant United States Attorney:
   THE COURT: Let me ask you this: What evidence in connection with this search would you propose to introduce in connection with the defendant's pending [tax evasion] trial? Currency receipts?
   THE GOVERNMENT: No, I am not going to use those. The only thing which we would at this time use is a copy of the note. But the leads are affected, the leads on the currency exchange thing. They are an integral part of the case. It is the fruit of the tree sort of thing.
   The actual documents are of no value to us. They are of no value to us in this case, except for one of them, and that is only a $5,000 note. The rest of them, some of them did provide leads to the Internal Revenue Service, some of this money—some of this stuff was known before.

a narcotics violation. United States v. Dichiarinte, 385 F.2d 333, 336–337 (7th Cir. 1967), cert. denied, 390 U.S. 945, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968).[6]

The Government contends that the delay which occurred prior to the indictment was reasonably necessary to the accomplishment of the complex investigation which is required to reconstruct a taxpayer's income by the net worth method. Further, the Government contends that the defendant was aware of the investigation and was consequently able to begin preparing his defense even though formal charges had not yet been brought. As for the postindictment delay, the Government argues that so much of it as was not caused by the defendant was acquiesced in by him. In any event, the Government argues, defendant waived his rights by failing expressly to demand a speedy trial.

Since we have determined that defendant's conviction must be reversed on other grounds, we do not think it appropriate for us to attempt at this time to resolve the difficult constitutional issues which have been raised. Since there is no certainty that the Government will attempt a retrial and since the factual setting out of which the sixth amendment claim arises may be very different if a retrial is attempted, we will not reach out to decide this difficult constitutional question before it is unavoidably presented to us. The issue may more properly be determined if the defendant is in fact retried. *See* Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1238–1239 n.9 (1968), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); Gross v. United States, 133 U.S.App.D.C. 94, 408 F.2d 1297 (1969).

Though we intimate no opinion on the correctness of the district court's denial of the motion to dismiss and the failure to hold a hearing on that motion, we believe that in the interest of judicial economy a hearing should be held on defendant's allegations in the event the Government seeks a new trial. When delay of this magnitude has occurred, a careful inquiry into the source of the delay and possible prejudice flowing from it is required. The briefs on this appeal contain conflicting assertions concerning responsibility for, acquiescence in, and prejudice resulting from the delay; and we are required to search an extensive record for facts which are seldom clearly revealed. The parties' presentation to the trial court of their evidence concerning the delay will narrow the scope of the search and facilitate the *fact finding process.* We leave to the district judge in the first instance the responsibility for finding the facts and determining whether defendant's sixth amendment rights have been prejudiced.

### III

The defendant also challenges certain evidentiary rulings of the district court, the sufficiency of the evidence to sustain his conviction, and the denial of his motion that the district judge recuse himself. The denial of the motion to recuse was not error. The fact that the judge might have formed an opinion concerning the guilt or innocence of the defendant from the evidence presented at an earlier trial involving the same person is not the kind of bias or prejudice which requires disqualification. United States v. Bolden, 355 F.2d 453, 456–457 (7th Cir. 1965), cert. denied, 384 U.S. 1012, 86 S.Ct. 1919,

---

6. Defendant has assigned as an independent error the failure of the district judge to transfer this case to the Executive Committee of the district court for reassignment. The motion to transfer was based on the alleged Government misbehavior set out in our prior opinion. 385 F.2d at 336–337. As we said there:

  [T]hese local rules exist for the purpose of governing the flow of work in the dis-

trict court as sensibly and efficiently as possible, and not to create a right in a litigant to have his case heard by a particular judge.

We do not find any reversible error in the failure to transfer. The Government's alleged procedural maneuvering, if proved, is relevant only to the question whether there was unnecessary and prejudicial preindictment delay.

16 L.Ed.2d 1018 (1966); *see* United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). We need not reach the alleged evidentiary errors or the sufficiency of the evidence because there is no reason to believe that the same questions will arise if the defendant is retried.

The judgment of conviction is reversed and the cause is remanded for further proceedings.

STEVENS, Circuit Judge (dissenting).

Judge Decker conducted an extensive hearing on defendant's motion to suppress the evidence seized during the search of the Dichiarinte home on March 9, 1960. Eight witnesses, including four agents, three members of the Dichiarinte family and defendant's lawyer, testified at the hearing. The principal factual issue raised by the motion concerned the voluntariness of the consent to search, but Judge Decker also considered the scope of the consent. After hearing the evidence, he expressly stated that he credited the testimony of the agents and did not credit the conflicting testimony of the defendant and his wife.[1]

In support of his order denying the motion to suppress, Judge Decker entered findings of fact and conclusions of law. After describing the circumstances of the arrest, he found that the agents conducted a search of the entire house which lasted for 45 minutes to an hour; that no narcotics were found, but that the "agents seized a number of receipts and documents bearing aliases and variations of the defendant's name which had come to the agents' attention in the course of the conspiracy investigation culminating in the defendant's indictment."[2]

The court further found that during the course of the search, "Rosenthal reminded defendant that he did not have to allow the agents to search, but defendant replied that he had told them they could search all they wanted and that they wouldn't find anything."[3]

Finally, the court found that although defendant sought to call off the search 10 or 15 minutes before the agents actually left, they did not seize any evidence after that point in time. The court concluded that the evidence establishing defendant's consent was "clear and positive" and that the "* * * attempted revocation of consent does not affect the materials sought to be suppressed because nothing was seized subsequent to it." The district court's findings of fact are supported by the record.[4]

After further pretrial proceedings, defendant filed a motion to reconsider the order denying the motion to suppress. The principal contention made in the motion to reconsider was that the items seized were beyond the scope of defendant's consent, which was limited to a search for narcotics and, therefore, did not encompass evidence of income tax evasion. Judge Decker granted the motion to reconsider, took additional evidence, and then denied the motion to suppress for a second time. He reentered his original findings of fact and conclusions of law and, in addition, filed a memorandum opinion directed specifically to the question whether the seizure was beyond the scope of the search to which defendant had consented. He stated in part:

"Upon the instant motion for reconsideration, defendant stresses that Dichiarinte's consent extended only to

1. Appellant's version of the events was dramatically belied by his signature on a receipt for the items taken during the consent search. He signed the receipt in the presence of his counsel, who had specifically asked whether he had consented to the search.

2. Finding No. 11 entered on February 5, 1965.

3. Finding No. 12.

4. For example, at p. 165 of the transcript, Agent Olivanti testified:
 "We were talking about basket ball and horse racing and then Mr. Rosenthal had said to Mr. Dichiarinte, 'If I were you, I wouldn't let them search any more.'
 "Mr. Dichiarinte said, 'I told them they could search all they want. They are not going to find nothing.'"

a search for narcotics, not also to evidence of tax evasion."

The opinion then briefly reviewed the facts and applicable legal principles and stated:

"A consensual search may, however, be restricted by the accused; specifically, Dichiarinte might have limited this search to narcotics. But he did not do so. Instead, he gave the agents full permission to search the entire house. Thus, whether related to the narcotics arrest or otherwise, any evidence so obtained is admissible, at least until the defendant revoked his consent."

I find nothing in Judge Decker's analysis of the law which differs from the majority opinion of this court.

If we had heard the evidence *de novo*, we might well have formed a different impression with respect to the credibility of the witnesses and have interpreted the scope of defendant's consent more narrowly than did Judge Decker. However, his findings of fact are supported by the testimony of the agents whom he credited. Since the findings are not clearly erroneous, I respectfully dissent.