UNITED STATES of America, Plaintiff,

v.

Henry WHITE, Defendant.

UNITED STATES of America, Plaintiff,

v.

$38,394 U. S. CURRENCY, Defendant,

Henry White, Claimant.

Nos. 80 CR 159, 80 C 3610.

United States District Court,
N. D. Illinois, E. D.

May 28, 1982.

Supplemental Memorandum Opinion
June 9, 1982.

Cynthia Giacchetti, Asst. U. S. Atty., Chicago, for plaintiff.

Gail A. Niemann, Thomas R. Mulroy, Jr., Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Henry White ("White") was arrested on a charge of possession of heroin with intent to distribute. Immediately after his arrest government agents searched another apartment in the same building (White owned the building) and seized $38,394.[1] This Court conducted a trial of the criminal offense and a separate hearing under Fed.R. Crim.P. ("Rule") 41(e), the latter on White's motion for return of the money as having been seized unlawfully. White was convicted on the criminal charge but prevailed on his Rule 41(e) motion.

Our Court of Appeals then upheld the conviction but reversed the Rule 41(e) ruling. *United States v. White*, 660 F.2d 1178 (7th Cir. 1981). It did not reach (660 F.2d at 1184 n.8)—and this Court must now decide—whether the search itself was lawful. For the reasons stated in this memorandum opinion and order White's Rule 41(e) motion is granted and the related civil forfeiture action is dismissed as moot.[2]

---

1. Government agents seized a total of $42,194, of which $3,800 turned out to be prerecorded government funds used in prior heroin purchases. Those funds were the subject of a separate uncontested forfeiture action.

2. After this Court had ordered the money returned the government reseized it and filed a civil forfeiture action under 21 U.S.C. § 881(a)(6). *United States v. $38,394*, 80 C 3610. White challenged that seizure and this Court granted White's motion for summary judgment on the ground that the government

*Facts*[3]

In November 1979 the Organized Crime Division of the Chicago Police Department joined forces with the Drug Enforcement Administration ("DEA") to investigate White's heroin-selling activities. That investigation culminated the evening of March 11, 1980 when undercover agents Christine Kolman ("Kolman") and John Duckhorn ("Duckhorn") went to White's apartment building, ostensibly to purchase heroin. Upon arrival they found White in the first floor apartment along with Raymond Council ("Council") and Bernard Rogers ("Rogers"). After agents negotiated a deal Kolman left the apartment with Rogers, supposedly to get money from her car.

Kolman's action was the signal for other agents who had surrounded the building. Rogers was arrested upon leaving the building and the agents took his keys so they could gain entry to the apartment. About six to eight agents, some with guns drawn, entered the first floor apartment unannounced. Within minutes 12 agents were in the apartment. White and Council were arrested immediately.

Rogers was brought back into the apartment, and all three were handcuffed and read their *Miranda* rights. Council and Rogers refused to cooperate, but White agreed to waive his *Miranda* rights. Because White appeared cooperative, Sergeant Cline ("Cline") and DEA agent John Gallagher ("Gallagher") took White, alone, out to the back porch. They asked him if there was any heroin in the apartment other than what had been found in the kitchen. White responded there wasn't. One of the agents then asked if they could search the third floor apartment (intending to see if there was any other heroin), and White agreed. Government agents immediately searched that apartment and, under circumstances described later in this opinion, found the $38,394 in a flight bag in a closet.

was collaterally estopped from asserting the legality of the seizure. *United States v. $38,-394*, 498 F.Supp. 1325, 1326–27 (N.D.Ill.1980). Our Court of Appeals vacated that order because of the Rule 41 reversal.

*Voluntariness of the Consent*

 Initially the government contends the search was lawful because of White's consent. This Court finds White did agree to let the agents search the third floor apartment for heroin. But that does not end the inquiry, for the government has the burden of proving consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). White's consent must therefore be examined in the totality of circumstances to determine if there were any express or implied coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

There was no express coercion. For example, the agents did not tell White if he refused to consent they would obtain a search warrant anyway. But a consent can be involuntary because of a coercive atmosphere. *See, United States v. Gillespie*, 650 F.2d 127, 129 (7th Cir. 1981). On that score the relevant factors line up this way:

*Indicating Voluntariness:*

(1) At the time of consent neither officer had his gun drawn.

(2) There is no evidence of any threats, promises or subtle coercion.

(3) White had substantial prior contact with the law.

(4) White's co-conspirators refused to cooperate. *United States v. Goldstein*, 635 F.2d 356, 362 (5th Cir. 1981).

*Indicating Coercion:*

(1) White was under arrest and handcuffed.

(2) White was asked to consent just a short time after 12 armed officers stormed his apartment.

(3) There was no written consent. *United States v. Dichiarinte*, 445 F.2d 126, 128 n.1 (7th Cir. 1971).

3. This case presents some material discrepancies in testimony among the several law enforcement officers, as well as the to-be-expected disparities between White's version of events and that of the officers. This Court has resolved any issues of credibility by finding the facts as stated in this opinion.

(4) White was not informed that he could refuse to permit the search.

Oral consents obtained from an arrested subject require careful scrutiny. As the Supreme Court put it in *Schneckloth*, 412 U.S. at 231–32, 93 S.Ct. at 2049–50 (emphasis added):

> Consent searches are part of the standard investigatory techniques of law enforcement agencies. They normally occur on the highway, or in a person's home or office, *and under informal and unstructured conditions.*

While this is a close case, the Court finds the government has met its burden. Several factors are persuasive. First, in addition to permitting the search, White waived his *Miranda* rights though his co-conspirators did not under identical conditions. Second, the consent took place during a quiet conversation on the back porch. Matters would have been very different had White been asked to consent just after the arrest in the living room, while he was faced by 12 agents, many with guns drawn. Finally, White has a long arrest record and has been in similar situations before. As part of the congeries of factors, those items particularly demonstrate White was able to choose voluntarily whether to let the agents undertake the search.

Though every such case is necessarily somewhat distinguishable, the closest authority this Court has found is *United States v. Valencia*, 645 F.2d 1158 (2d Cir. 1980). There defendant was arrested by a DEA task force outside her apartment. In response to a question she told agents another suspect was inside the apartment. When the agents then asked defendant if they could enter the apartment, she did not respond but walked in that direction, with the agents following and entering the apartment without protest. At that point the other suspect was arrested and both were read their *Miranda* rights. Then an agent asked defendant if he could search the apartment and she replied she had

"nothing to hide." On those facts the Second Circuit upheld the district court, which had found the consent voluntary.

### Scope of the Consent and Search

White contends even if his agreement were held voluntary, he gave only a limited consent: to search the third floor apartment for heroin. If so, he urges, the government unlawfully exceeded the scope of that consent by searching for currency. In the government's view, however, White gave a general consent to search the apartment.

■ On that critical issue the officers' accounts of the conversation during which White gave his consent are quite close. Cline testified that when he, Gallagher and White walked out onto the back porch, he asked White if he had any more heroin. White said he didn't. Because Cline believed there was heroin elsewhere in the building he then asked White if he could search the third floor apartment and White responded, "Go ahead and search. I told you that is all I have." Gallagher testified White answered Cline's question, "Go ahead and search. There is nothing up there." Either version clearly shows White understood the agents were interested in finding heroin and were asking if they could search the third floor apartment for that substance. This Court finds White did *not* give permission for a general search of his apartment but rather consented to a limited search for heroin.[4]

■ If a search is conducted pursuant to a consent, any part of the search not within the bounds of the consent is unlawful. *Dichiarinte*, 445 F.2d at 130. Thus the next question is whether the search of the flight bag containing the $38,394 was properly within the scope of White's consent.

Three officers (Cline, Gallagher and Clarence Thomas ("Thomas")) testified and provided conflicting versions of how the money

---

4. Although not essential to its finding, the Court notes it is particularly appropriate to give White's consent a limited reading in light

of the close question of "coercive atmosphere" already discussed in this opinion.

was actually found. This Court credits Cline's recollection of the events: [5]

(1) Cline and several officers went up to the third floor apartment and knocked on the door. Zenobia Anderson ("Anderson") answered and was told White had been arrested and had given consent to have the apartment searched.

(2) Before beginning the search Cline asked Anderson, "Is there any money in the apartment or any jewelry, anything expensive like that?" (Tr. 81). Anderson answered there was money in a closet.

(3) Anderson then went to the closet and pointed out a bag. Cline picked up the bag and asked how much was in there. Anderson said, "$40,000." Then the bag was brought into the kitchen and searched and the money was seized.

This Court finds Cline was specifically searching for money, not heroin, when he searched the travel bag. Because White had consented only to a search for heroin, Cline exceeded the scope of that consent. Accordingly the search violated the Fourth Amendment.

That result may at first blush seem somewhat anomalous. Had Cline *not* asked Anderson about any money in the apartment, had he simply come across and searched the travel bag in the normal course of looking for heroin, this Court would likely have upheld the search. Had that been the situation it would certainly have been reasonable to consider that heroin could be hidden in a flight bag.

But those are not the facts as this Court finds them. By his own admission Cline was clearly searching for money, not heroin, when he seized and opened the flight bag. And the distinction is critical in legal terms.

In essence this Court has found it was Cline's specific subjective intent to search for money. For obvious reasons evidence of the subjective intent of a police officer conducting a search is rare indeed. In the vast majority of cases, with no such evidence, courts must infer intent from the nature of officers' actions. Thus the determination usually distills down to whether an officer could *reasonably* have been looking for a particular item where he was searching. For example, if an officer were given consent only to search for rifles it would be unlawful to open a pill box. Even though the court had no direct evidence of what was going through the officer's mind when he did so, it would infer from his actions that he was not searching for rifles.

But the fact that evidence of subjective intent is seldom available does not mean it can be ignored when the officer is candid as to what he is about. Limited consent, like a specific warrant, circumscribes the discretionary power of the officer to conduct the search. *Dichiarinte,* 445 F.2d at 129. He can properly delve into only those items he honestly believes, based on reasonable grounds, he is searching within the scope of that consent. That honest belief is just as important as the reasonable basis for that belief. This is effectively the same standard that would be used in a suit under 42 U.S.C. § 1983 to test an officer's good faith in conducting a search. *Wood v. Strickland,* 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975).

No other circumstances justify searching the travel bag. *Anderson* could not have consented to a search of the travel bag, for the officers' statement to her plainly indicated White had already given a general consent to search the apartment. Thus she was never even asked to consent to any kind of search. Nor were there any exigent circumstances. While the officers might arguably have had probable cause to believe a sum of cash (if found) was related to a heroin transaction, there was nothing to prevent them from securing the travel bag and obtaining a search warrant.

### Conclusion

By diverting and enlarging the search to money instead of heroin, the government

---

**5.** It does so for two reasons:

(1) Cline's testimony was the most comprehensive and trustworthy of all the government agents'.

(2) Cline's testimony primarily established the consent (which White denied giving). If Cline is considered credible on that critical issue, he is on the other as well.

exceeded the scope of the consent obtained from White. There being no lawful basis for the search, this Court finds the search of the travel bag and the resulting seizure of the currency unlawful. White's motion under Rule 41(e) is granted. Because the government will no longer have legal possession of the money, its related civil forfeiture action is dismissed as moot.

## SUPPLEMENTAL MEMORANDUM OPINION

Just after this Court issued its May 28, 1982 memorandum opinion and order (the "Opinion") finding the government's search of Henry White's travel bag and seizure of its contents ($38,394 in currency) invalid, the Supreme Court handed down its June 1 opinion in *United States v. Ross*, —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572. *Ross* committed *Robbins v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981) to an early grave and announced a newly-broadened version of the "automobile exception" to the Fourth Amendment's warrant requirement. Because *Ross* has obvious implications for any search-and-seizure decision, this supplemental opinion is being written.

As Justice Stevens wrote for the Court in *Ross*, —— U.S. at ——, 102 S.Ct. at 2163:

The rationale justifying a warrantless search of an automobile that is believed to be transporting contraband arguably applies with equal force to any movable container that is believed to be carrying an illicit substance. That argument, however, was squarely rejected in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538.

It is obvious from the Court's discussion and treatment of the issues that some container locations are less equal than others, for better or worse and however illogical some of the distinctions in application may appear. Rules that apply to containers in automobiles do not necessarily apply with full vigor to containers found elsewhere.

If only for that reason, the full impact of a Supreme Court *decision* is not necessarily to be ascribed to Justice Stevens' dictum about non-automobile searches, *id.* at ——, 102 S.Ct. at 2169–71:

A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marijuana would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.

But even taking the quoted statement at face value, it does not compel a different result here.

In the Opinion this Court held the government to the purpose its own agents had announced for the search of the flight bag—a hunt for money and jewels, not narcotics. It would not permit the government, having set its own ground rules for that search, to say in effect:

We *could* have searched the flight bag for drugs under the consent as originally given by White.[1] Indeed we would likely have done so, because it was logical to do so in the course of our search of the entire apartment. Had we searched the flight bag we would have found the money. White therefore cannot complain be-

---

1. This is of course correct.

cause we found the money as the result of an unauthorized search.

That kind of argument really does away with the significance of the warrant—or its substitute, the consent. It would vitiate a critical part of Justice Stevens' final quoted sentence—that "a legitimate search [be] under way" and that "its purpose and its limits have been precisely defined...." Post hoc reasoning about what the government *might* have done, like all efforts at revisionist history, does not commend itself to this Court. It therefore adheres to the reasoning and conclusion expressed in the Opinion.