UNITED STATES of America

v.

**Cliff CASMENTO and John Falcone, Defendants.**

No. 97 Cr. 0879 (MBM).

United States District Court, S.D. New York.

March 27, 1998.

Mary Jo White, U.S. Attorney for the Southern District of New York, Bonnie B. Jonas, Marc L. Greenwald, Assistant U.S. Attorneys, New York City, for U.S.

Murray Richman, Adam M. Jaffe, Bronx, NY, for Cliff Casmento.

### OPINION AND ORDER

MUKASEY, District Judge.

Cliff Casmento, a convicted felon charged with possessing firearms in violation of 18

U.S.C. § 922(g)(1) (1994), has moved to suppress statements he made and guns seized from a basement to which he had access. He argues that the statements were made when he was in custody but before he had been warned of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that the guns were seized during a search to which he had not validly consented. As set forth below, based on the evidence presented at a hearing on January 16 and 21, 1998, it appears that Casmento had no reason to believe that he was in custody at the time he made the statements in question, and that he validly consented to the search. Accordingly, the motions to suppress are denied.

## I.

Two New York City detectives, a federal agent and Casmento's grandmother testified at the hearing. Their testimony showed that on August 18, 1997, Detective Robert Baumert was informed by a then-former girlfriend of Casmento that Casmento was a convicted felon who unlawfully possessed two hunting rifles. (Tr. 3, 31–32, 34–35) The detective verified Casmento's criminal record, and then arranged the following day for the former girlfriend to place a call to Casmento confirming his possession of the firearms, and to record the call. (*Id.*) During the call, Casmento stated that he had the weapons stored in the basement of the house where he was then residing. (Tr. 35) Baumert believed that Casmento posed a danger to the former girlfriend, and went immediately to the appliance store Casmento owned in order to arrest him. (Tr. 3–4)

In addition to selling appliances from his store, Casmento also repaired beepers. When Baumert and another detective, named Ward, arrived at the store, the door was locked, but Baumert could see Casmento inside. He held up his beeper, and Casmento mouthed the word "problem"; Baumert confirmed that he had a problem with his beeper, and Casmento admitted him into the premises. (Tr. 6–7) Baumert acknowledged at the hearing that he intended to arrest Casmento at the time he entered the store; as he put it, "a custodial situation started

from the time I entered the premises at 3:40." (Tr. 31)

After Baumert and Ward had entered the store, Casmento went behind the counter. Baumert stood in the space between the counter and the wall, the space through which Casmento had walked in order to go behind the counter; Ward stood in front of the counter. Baumert's position was such that Casmento could not have walked out from behind the counter without encountering Baumert or asking the detective to stand aside. (Tr. 9–10)

Once inside the store, Baumert told Casmento that he did not have a problem with his beeper but had come to discuss a problem of another kind. When he showed his police identification, Casmento asked whether it concerned his former girlfriend; Baumert responded that that was part of the problem, and asked Casmento whether he had any guns. When Casmento responded that he did not, Baumert asked specifically whether he had two hunting rifles; Casmento acknowledged that he did but suggested that he did not consider them "guns" (Tr. 7), perhaps because they were not handguns. Casmento conceded, in response to the detective's question, that he was a convicted felon, and Baumert told him it was unlawful for him to possess firearms of any kind. Casmento offered to give the guns to the detective, but Baumert said matters had gotten beyond that; Casmento had to be arrested. (Tr. 7–8)

At that point, Baumert told Casmento that he was under arrest, and that Ward would read him the *Miranda* warnings. Casmento said he was aware of his *Miranda* rights, but Ward proceeded to read them anyway. (Tr. 8) Until that point, neither detective had displayed a weapon or touched Casmento. (Tr. 8–9) Thereafter, Casmento made two telephone calls, told one of his employees to call the florist and cancel an order of two dozen roses he was going to send to the former girlfriend who then appeared to be responsible for his predicament, turned over his cash and other personal effects to his employees, and gave Baumert permission to search his car. (Tr. 10–14) The detectives declined Casmento's request to leave his

store without handcuffs so as to avoid being made a spectacle in front of his business neighbors, but they did accommodate him to the extent of moving their unmarked car as close to the entrance of the store as possible and taking Casmento out as unobtrusively as they could. (Tr. 14)

During the ride to the precinct, Casmento *again offered to give the officers the guns* in the hope that they would "forget about it." (Tr. 16) Baumert explained that Casmento's former girlfriend had filed a complaint against him and the matter could not be disposed of so easily. (*Id.*) When they arrived in front of the precinct, Sergeant John Valdes approached the car where Casmento was still seated, and asked him if he had guns in his house and whether he would surrender them. Casmento said he had and would. (Tr. 16) A caravan of about four police vehicles headed for the house where Casmento was then residing, with Casmento providing instructions on how to get there. (Tr. 16)

During the ride, Casmento asked whether Baumert could help him, and the detective replied that Casmento should be honest and cooperative, and that if he had information about other crimes he should provide it. The detective also offered to make any cooperation known to the United States Attorney's office, and to help Casmento to the extent he could. (Tr. 17)

The house to which Casmento led the officers was a three-family dwelling, one apartment of which was then occupied by Casmento's grandmother, another by Casmento's mother and, after he split up with his former girlfriend, Casmento (Tr. 22, 68), and the third by an unrelated tenant. (Tr. 68, 70) Upon arrival, they entered Casmento's grandmother's apartment. When she appeared upset at the sight of her grandson in handcuffs, the officers removed them, and Baumert explained to the grandmother, Rose Zacco, that "Cliff was having some problems with his girlfriend Jennifer, and also we had a problem that Cliff was in possession of guns, that we needed to get them." (Tr. 18) Baumert filled out and proffered to Casmento a consent to search form, which Casmento appeared to sign. (Tr. 18–19; GX 1) After

Casmento had affixed a signature to the form, his grandmother summoned a neighbor named Joe, apparently the occupant of the third apartment, and told him to open the door to the basement. (Tr. 21) Joe took a key from atop a door jamb, and Casmento, Valdes and Baumert entered the basement. Casmento showed the officers where the rifles were located, and volunteered that he also had bows and arrows and hunting knives. Baumert explained that there was no law prohibiting a convicted felon from possessing knives or bows and arrows, so there was no need to surrender those. Baumert took the rifles, and the three men went back to the grandmother's apartment. (Tr. 23–24)

As the officers prepared to leave with Casmento, special agent Laurie Horne of the Bureau of Alcohol, Tobacco and Firearms noticed that Casmento had not signed his own name on the consent form but instead had written "Rose Casmento." Casmento explained that that was his mother's name. Baumert took the form, crossed out the name "Rose Casmento," and asked the defendant to sign his own name; Casmento refused. (Tr. 24–25) Horne then took the form and said she would go back inside and get the grandmother, Zacco, to sign it because Zacco had gotten the neighbor, Joe, to open the basement door. (Tr. 25)

Horne and Zacco gave differing accounts of how Zacco's signature ultimately came to grace GX 1, the consent form. According to Horne, the encounter was uncommonly civilized:

> She was nice, she let me in the apartment. She wanted me to go to the back room to get her glasses. I read her the form, then she signed it. I told her how she could get in touch with her grandson later in the day. Then I left.

(Tr. 56) Horne added that Zacco had read the form before she signed it.

Zacco recalled that a few minutes after she had spoken to her neighbor Joe,

> the detective came in with a paper and pencil and pen; he said sign this paper.
>
> Q. He said or she said?

A. She said or he. There were two of them; there was a man and a woman, but he is the one I dealt with. The man was the one who told me to sign the paper.

Q. Did you know what you were signing?

A. No.

Q. Did you read the paper?

A. No.

(Tr. 68) Despite the presence of her signature on the consent form, Zacco insisted, "I didn't give nobody permission or nothing." (*Id.*)

## II.

■ *Miranda* warnings must be administered before law enforcement officers question a suspect who is in custody. *Miranda*, 384 U.S. at 444. Supreme Court "decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam). A suspect is considered in custody for *Miranda* purposes if "a reasonable person in [the suspect's] shoes would [not] have felt free to leave under the circumstances." *United States v. Ali*, 86 F.3d 275, 276 (2d Cir.1996) (quotations omitted). Whether or not a law enforcement officer has formed a subjective intent to arrest the suspect is irrelevant so long as that intent is not communicated in some fashion to the suspect. *See Stansbury*, 511 U.S. at 323–25; *Michigan v. Chesternut*, 486 U.S. 567, 575 n. 7, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *United States v. Mendenhall*, 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

■ In this case, there was no display of weapons and no touching of Casmento before he was told he was under arrest; the conversation until that point was entirely polite and devoid of the threat of arrest. Although Baumert stood in the space through which Casmento would have had to pass if he had tried to leave, there is no evidence that he did try or even want to leave. The setting was not a police station but Casmento's own store, and he was behind the counter, in the accustomed place for one conducting business on his own premises. Even at the time Casmento was told that it was unlawful for him to possess the rifles he admitted to owning, he was obviously of the belief that this was not a serious matter and that whatever problem existed could be solved simply by surrendering the weapons, a course he himself proposed. In these circumstances, when the officers made no show of force and the matter under investigation—unlawful possession of hunting rifles—did not immediately suggest the likelihood of an arrest, a reasonable person in Casmento's position would have believed he was free to leave until the time Baumert notified him that he was under arrest. Because Casmento was not in custody when he made the initial admissions to Baumert and Ward, those admissions need not be suppressed. Nor need his later admissions, made after receiving concededly sufficient *Miranda* warnings, be suppressed as the fruit of his initial admissions, the initial admissions themselves having been lawfully obtained.

## III.

■ Casmento's motion to suppress the fruits of the search yields the same result as his motion to suppress statements. For the reasons summarized briefly below, it is apparent that consent to search was freely given by Casmento himself, and there is no need to resolve whatever inconsistency there may be in the testimony given by Horne and Zacco, respectively.

Both before and soon after his arrest, Casmento apparently was of the view that he could or should be able to talk himself out of custody, or at least ameliorate his situation, by promptly turning over the firearms to the police. Indeed, even before he was arrested, Casmento suggested to Baumert that he would simply surrender the firearms. (Tr. 7–8) After his arrest, Casmento permitted the officers to search his car. (Tr. 13–14) During the ride to the precinct, Casmento continued to offer to surrender the firearms in the hope that the authorities could then

"forget about it." (Tr. 16) Outside the precinct, Casmento readily agreed to surrender the firearms and indeed provided directions to guide law enforcement officers to the house where they were located. (*Id.*) During the ride to the house, Casmento continued to inquire into how he could help himself out of his predicament. (Tr. 17) Upon arrival at the house, when a consent form was proffered, Casmento appeared to sign it willingly. (Tr. 18–19; GX 1) Thereafter, he accompanied the officers to the basement to show them where the firearms were located, and offered to surrender other weapons—bows and arrows and hunting knives—even though the officers had not asked about them. (Tr. 23–24)

Which is to say, Casmento displayed from before his arrest until after the firearms were recovered an unflagging willingness to permit the police to recover them. Indeed, he appeared to be pursuing a strategy of relentless cooperation in the hope that it would help him. Only upon later inspection did it appear that he had put his mother's name on the form. At that point, when the officers apparently were about to deliver Casmento for overnight lodging at the Metropolitan Correctional Center ("MCC"), he declined to affix his own signature to the form (Tr. 24–25), and thereby exhibited the first non-cooperative behavior since his initial conversation with Baumert.

Whether Casmento's placement of his mother's name on the form was itself a non-cooperative signal is impossible to determine from this record. The apartment apparently was hers, not his (Tr. 22, 68), and so it may be that he, applying the legalism of a non-lawyer, believed that it was actually helpful to sign his mother's name inasmuch as she was the occupant of the apartment who had storage rights in the basement. Alternatively, he may simply have been seeking to sow a later legal issue by signing a name not his own should his cooperative conduct fail to yield immediate benefits. Casmento did not testify at the hearing, so one can only speculate on what his reason may have been for signing his mother's name to the form. By the time the agents realized that Casmento had not signed his own name, the rifles already had been retrieved and Casmento was about to be carted off to the MCC. Two things must have seemed obvious to Casmento at that time: first, notwithstanding his cooperation, the police were not going to "forget about it," at least not to the extent of letting him go; and second, the law enforcement officers seemed to attach importance to whose signature appeared on the form, and that signature might present an issue Casmento could use to his advantage at a later date should a more aggressive stance seem advisable.

Whatever was going through Casmento's mind at the time he refused to sign his own name on the form, it could not undo his earlier compliant conduct. Here, it bears emphasis that this case is governed by the law of crimes, not by the law of negotiable instruments. Under the law of crimes, it is the reality of consent, not the presence of a proper signature on a document, that controls. Thus, a defendant can waive his Sixth Amendment right to counsel, and his Fifth Amendment right to remain silent, without doing so in writing. *See United States v. Spencer*, 955 F.2d 814, 819 (2d Cir.1992) ("defendant's refusal to sign a waiver form is not dispositive" of whether he voluntarily waived his rights), and cases cited therein. Similarly, he can waive, even orally, his Fourth Amendment right to insist on a search warrant before premises in which he has a privacy interest may be searched, although such waivers, whether written or not, are examined particularly closely for evidence of coercion or duress. *See United States v. Dichiarinte*, 445 F.2d 126, 128–29 & n. 1 (7th Cir.1971), and cases cited therein.

To be sure, the burden is on the government to prove that "consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). However, when a defendant himself offers even before his arrest to surrender weapons, when he presses that offer after his arrest, when he gives permission to search his car, when he then reiterates his agreement to surrender the weapons and gives law enforcement officers directions to reach the house where the weapons are located, and when he then leads

those officers voluntarily to the basement within that house and shows them where the weapons are, it is impossible to say that there was no consent to the search—if one can properly call it a search, the weapons having been pointed out by the defendant—and the subsequent seizure.

In view of the above findings, there is no need to discuss the government's alternative argument that the rifles inevitably would have been discovered had Casmento insisted that the officers procure a warrant.

For the above reasons, Casmento's motions to suppress statements and evidence are denied.

SO ORDERED.