USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

No. 98-1258

 UNITED STATES OF AMERICA,

 Plaintiff, Appellant,

 v.

 DANIEL TURNER,

 Defendant, Appellee.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Morton A. Brody, U.S. District Judge]

 

 Before

 Selya, Circuit Judge,

 Cyr, Senior Circuit Judge,

 and Stahl, Circuit Judge.

 

 F. Mark Terison, Assistant United States Attorney, with whom Jay P.
McCloskey, United States Attorney, and Gail Fisk Malone, Assistant
United States Attorney, were on brief for appellant.
 James C. Munch III, with whom Terence M. Harrigan and Vafiades,
Brountas & Kominsky were on brief for appellee.

 

 February 26, 1999
 CYR, Senior Circuit Judge. After police detectives
discovered several nude photographs in his personal computer files, 
defendant Daniel Turner was indicted for possessing child
pornography in violation of 18 U.S.C. 2252. Thereafter, the
district court suppressed the photographs and the government
brought this interlocutory appeal. See id. 3731. We affirm the
district court ruling, albeit on different grounds.
 I
BACKGROUND
 At 2:00 a.m. on July 28, 1997, 26-year-old Megan Thomas
was awakened in her bedroom by a masked intruder wielding a knife. 
During the ensuing struggle Thomas cut her hands when she grabbed
the knife. The intruder fled. Turner, who lived in the apartment
next door to Thomas, notified the Bangor police. When police
detectives arrived at the scene, Turner told them that while seated
upstairs at his computer he had observed the intruder fleeing the
Thomas apartment, then telephoned the police.
 The next morning, Bangor Police Detectives Reagan and
Gould returned to the crime scene for further investigation, and
noticed that window screens on both the Thomas and Turner
apartments were ajar and the sill on the Turner apartment was
smeared with blood. The detectives awakened Turner, told him about
these discoveries, and expressed their concern that the intruder
might have entered Turner's apartment as well. Turner responded by
handing the detectives a knife which he claimed to have found near
his kitchen sink, but did not remember having placed there. The
knife fit the description Thomas had given the police earlier.
 The detectives then obtained verbal consent to "look
around" Turner's apartment. At that point Turner was not
considered a suspect in the Thomas assault. Turner accompanied the
detectives on their initial tour of his apartment, during which
they found additional blood stains on the stairway walls leading to
the second floor, and on a trash can lid in the computer room on
the second floor. When asked about these discoveries, Turner could
provide no explanation.
 The detectives then began to suspect that Turner was the
assailant. At their request, Turner signed a written consent to
search "the premises," "his vehicle," and "personal property." 
Before doing so, he was expressly told that the officers would
search for "any signs the suspect had been inside [the apartment],"
"any signs a suspect had left behind, or anything of that sort,"
and "evidence of the assault itself."
 While a detective remained on the first floor with
Turner, other officers began their 90-minute search of the second
floor. In the closet of the second-floor computer room, Detective
Gould found several videotapes which apparently contained sexually
explicit material. Then, while removing boxes from the closet and
stacking them on or near the computer station, Gould noticed that
Turner's computer monitor screen suddenly turned on, and the
Windows "desktop" disclosed a photograph of a nude woman with
"light-colored hair," which Gould concluded was "similar" to Ms.
Thomas' hair color based on descriptions Gould had been given.
 At that point Gould seated himself at the computer and
engaged the "mouse" to access the "Documents" index from the
Windows 95 task bar, which itemized titles of files most recently
accessed by Turner. Gould noticed several indexed files with the
suffix ".jpg," denoting a file containing a photograph. After
clicking on these file names, he located photographs of nude blonde
women in bondage. Further into the "Documents" listing, he noted
several text files bearing titles which suggested rape and/or
bondage. After calling the district attorney's office for
guidance, Gould copied the adult-pornography files onto a floppy
disk.
 Gould then searched the computer hard drive for other
incriminating files. Opening the "My Computer" icon and a folder
labeled "G-Images," he noted several files with names such as
"young" and "young with breasts." Upon opening one such file, he
viewed what he believed to be child pornography, then closed down
and seized the computer. It was at this point that Turner first
came upstairs and discovered that his computer files had been
subjected to search.
 After Turner was charged in a single count with
possessing child pornography, see id. 2252, he moved to suppress
the computer files. The district court granted the motion
following a suppression hearing, on the ground that it was not
objectively reasonable for Detective Gould to have concluded that
evidence of the Thomas assault the stated object of the consent
search would be found in files with such labels as "young" or
"young with breasts."
 II
 DISCUSSION
 The district court ruled that even if the Turner consent
authorized the opening of nondescript files containing photographs,
it did not permit the opening of files labeled "young" or "young
with breasts," which were unlikely to contain evidence pertinent to
the Thomas assault. The government vigorously responds that the
consent was so broad authorizing search of all Turner's "personal
property" that it necessarily encompassed a comprehensive search
of his computer files. As we conclude that the consent did not
authorize the search of the computer, we affirm the district court
judgment. See United States v. Doe, 61 F.3d 107, 111-12 (1st Cir.
1995) (appellate court may affirm suppression ruling on any ground
apparent in the record).
 Since it comes within an established exception to the
Fourth Amendment warrant requirement, "[a] consensual search may
not exceed the scope of the consent given." United States v.
Rudolph, 970 F.2d 467, 468 (8th Cir. 1992). "The standard for
measuring the scope of a suspect's consent under the Fourth
Amendment is that of 'objective' reasonableness what would the
typical reasonable person have understood by the exchange between
the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251
(1991); United States v. Donlin, 982 F.2d 31, 33 (1st Cir. 1992). 
We therefore look beyond the language of the consent itself, to the
overall context, which necessarily encompasses contemporaneous
police statements and actions.
 "The scope of a [consensual] search is generally defined
by its expressed object." Jimeno, 500 U.S. at 251 (emphasis
added); Doe, 61 F.3d at 112 n.7; see United States v. Pena, 143
F.3d 1363, 1368 (10th Cir.), cert. denied, 119 S. Ct. 236 (1998);
United States v. Saadeh, 61 F.3d 510, 518 (7th Cir. 1995). For
example, in United States v. Dichiarinte, 445 F.2d 126 (7th Cir.
1971), police officers who sought consent to search the defendant's
premises had made "repeated reference to [their] interest in
narcotics [] and there was no indication that they desired to look
for anything other than narcotics themselves." Id. at 129. After
the defendant consented, however, the officers inspected personal
papers. The Seventh Circuit held that the search exceeded the
scope of the consent: "Government agents may not obtain consent to
search on the representation that they intend to look only for
certain specified items and subsequently use that consent as a
license to conduct a general exploratory search." Id. at 129-30 &
n.3 ("Thus if government agents obtain consent or a warrant to
search for a stolen television set, they must limit their activity
to that which is necessary to search for such an item; they may not
rummage through private documents and personal papers.").
 In the present case the detectives preliminarily
restricted the scope of the consent in several respects. Upon
their arrival at the Turner apartment early in the morning on July
28, the detectives, by their own admission, did not consider Turner
a suspect in the Thomas assault. See supra Section I, 2. 
Rather, after finding a window screen ajar in the Turner apartment,
they suspected that Thomas's assailant might have broken into the
Turner apartment while fleeing the crime scene next door, something
which Turner presumably need not have done to gain access to his
own apartment.
 Later, after finding a knife and scattered blood stains
for which Turner could provide no explanation, and before Turner
signed the written consent form, the detectives told Turner that he
was a suspect. The detectives nevertheless couched their search
request in terms normally understood to refer only to an intruder,
rather than a permanent resident, by announcing their intention to
look for "any signs the suspect had been inside [the apartment],"
and "any signs a suspect had left behind." See, e.g., United
States v. Elliott, 107 F.3d 810, 815 (10th Cir. 1997) (where
officer "explained to [the person whose consent was being sought]
that he just wanted to see how things were 'packed' or
'packaged[,]' [w]e conclude that a typical reasonable person would
have construed these additional statements as expressly limiting
the scope of [the officer's] request"); 3 Wayne R. LaFave, Search
and Seizure 8.1(c), at 620 (3d ed. 1996) ("When a purpose is
included in the [officer's] request, then the consent should be
construed as authorizing only that intensity of police activity
necessary to accomplish the stated purpose.").
 We think that an objectively reasonable person assessing
in context the exchange between Turner and these detectives would
have understood that the police intended to search only in places
where an intruder hastily might have disposed of any physicalevidence of the Thomas assault immediately after it occurred; for
example, in places where a fleeing suspect might have tossed a
knife or bloody clothing. Whereas, in sharp contrast, it obviously
would have been impossible to abandon physical evidence of this
sort in a personal computer hard drive, and bizarre to suppose 
nor has the government suggested that the suspected intruder
stopped to enter incriminating evidence into the Turner computer.
Cf. United States v. Kim, 27 F.3d 947, 956 (3d Cir. 1994) ("[W]hen
one gives general permission to search for drugs in a confined
area, that permission extends to any items within that area that a
reasonable person would believe to contain drugs.").
 Similarly, we cannot accept the government's contention
that the sexually suggestive image which suddenly came into "plain
view" on the computer screen rendered Turner's computer files "fair
game" under a consensual search simply because the Thomas assault
had a sexual component (e.g., the attempt to tie her hands). The
critical consideration in this regard is that the detectives never
announced, before Turner gave his consent, that they were
investigating a sexual assault or attempted rape. Nor is it
material to the present inquiry that Turner, as the alleged
assailant, would have been familiar with the details of the assault
based on his first-hand knowledge, since the test is not subjective
reasonableness, but objective reasonableness. See Jimeno, 500 U.S.
at 251.
 Thus, assuming arguendo that such computer images could
be considered circumstantial evidence of a planned sexual assault,
an objectively reasonable person assessing the actual exchange
between the detectives and Turner would not have understood that
such images were within the "expressed object" of the intended
search for evidence of an aggravated assault. See Elliott, 107
F.3d at 815 (finding that officer's contemporaneous statements
limited scope of consent); cf. United States v. Infante-Ruiz, 13
F.3d 498, 505 (1st Cir. 1994) (finding consent invalid where, interalia, police officer "did not notify [the consenter] that he was
looking for drugs, making it somewhat more difficult to impute to
[the consenter] consent to search every container within the car
that might contain drugs"). The objective reasonableness of this
understanding becomes even more clear when one considers the fruitsof the consensual search which had taken place just before Turner
signed the written consent; that is, the concrete physical evidence
associated with the assault itself, including scattered blood
stains and a knife which fit the description given by the victim. 
Moreover, when the detectives later announced their intention to
search for "evidence of the assault itself," an objectively
reasonable person likely would infer that they intended to search
for evidence of the same ilk; that is, for incriminating objects
directly linked to the nearby crime scene, not for documentary or
photographic evidence. See United States v. Gutierrez-Hermosillo,
142 F.3d 1225, 1231 (10th Cir.), cert. denied, 119 S.Ct. 230 (1998)
(courts must examine totality of circumstances in determining scope
of consent); United States v. Torres, 32 F.3d 225, 231 (7th Cir.
1994) (same); United States v. Huffhines, 967 F.2d 314, 319 (9th
Cir. 1992) (same).
 Furthermore, aggravated assault is neither akin to so-
called "paper trail" crimes like bank or mail fraud, nor to
possession of child pornography, wherein the suspect might be
expected to retain evidence of the offense itself among personal
papers or in a computer hard drive. See United States v. Hall, 142
F.3d 988, 995-97 (7th Cir. 1998) (noting that child pornographers
often download photographic images from the Internet, and store
them on hard drives). Thus, we believe that an objective
observer, witnessing in context the pre-consent exchange between
Turner and the investigating detectives, reasonably would construe
"evidence of the assault itself" to mean physical evidence linked
to the crime scene, rather than documentary or photographic
evidence.
 Finally, the government argues, even if Turner's original
consent was circumscribed, he expanded the authorization by failing
to object to the computer-file search. See, e.g., United States v.
McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)("[Defendant's] [f]ailure
to object to the continuation of the search . . . may be considered
an indication that the search was within the scope of the
consent.") (citations omitted). We find this argument lacking as
well, since the detectives testified that Turner was downstairs
with Detective Reagan throughout Detective Gould's search of the
computer located upstairs. Thus, Turner had no meaningful
opportunity to object before the computer search was completed. 
Cf. United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996)
("[Defendant] was present during the search; she could (and
should) have protested at the time if she believed [the police]
exceeded the scope of her consent, as it was her burden to limit
that scope.") (emphasis added). We emphasize, nonetheless, that
our decision is predicated upon the particular facts of this case,
and in no sense represents a per se rule on computer searches.
 Affirmed.