Larry R. FRASIER, Jr., Appellant–Defendant,

v.

STATE of Indiana, Appellee.

No. 07A01–0207–CR–239.

Court of Appeals of Indiana.

Aug. 26, 2003.

David C. Grupenhoff, Thomas M. Barr & Associates, Nashville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Appellant, Larry R. Frasier, Jr., brings this discretionary interlocutory appeal challenging the trial court's decision to deny his motion to suppress certain evidence. Frasier presents four issues for our review, which we restate as the following three:

I. Whether the search warrant issued by the trial court was supported by probable cause;

II. Whether, if the search warrant was improperly issued, the evidence obtained as a result of the issuance of the warrant is nevertheless admissible under the "good faith" exception; and

III. Whether images discovered during a search of Frasier's personal computer may properly be entered into evidence.

We affirm.

The record reveals that on November 1, 2000, Brown County Sheriff's Department Detective Scott Southerland prepared an affidavit seeking a search warrant authorizing a search of Frasier's residence. The affidavit being essential to the resolution of this case, we set forth the contents thereof:

"I, Scott Southerland, swear or affirm under penalties for perjury that the following is true.

I am a law enforcement officer with the Brown County Sheriff's Department. In that capacity I have received criminal information concerning Larry R. Frasier Jr. who resides at 6390 Oriole Drive, Nineveh, Indiana 46164.

Approximately ninety days ago, I talked with Deputy Bernie McGaha who told me he had received information from a concerned citizen, a person who wished to remain anonymous. (CS# 1) This person wished to remain anonymous because of fear of retaliation. CS# 1 told Deputy McGaha that he/she had been inside the Frasier residence. CS# 1 said he/she had seen processed marijuana and marijuana plants growing in the garage. CS# 1 further said that he/she has seen Frasier smoking marijuana in his house and in his yard, and that he/she had seen Frasier smoke marijuana with his daughter and/or son. CS# 1 also told Deputy McGaha that he/she had seen Frasier's daughter roll marijuana cigarettes for her father, and he/she thought it was likely that Frasier has molested his daughter. Frasier's daughter, [M.F.], is now 19 years old. CS# 1 said that he/she was shown pornographic pictures that Frasier had on his computer. CS# 1 believed these pornographic pictures were of children. CS# 1 told Deputy McGaha that he/she was shown lights used to grown marijuana plants indoors by Larry Frasier.

At about the same time, I talked with Deputy Randy Taggart who related a report taken from CS# 1 where CS# 1 reported in essence the same thing as CS# 1 reported to Deputy McGaha. CS# 1 did tell Deputy Taggart that he/she has seen Larry Frasier and his daughter [M.F.] come outside the house when they were apparently wearing only towels. CS# 1 told Deputy Taggart he/she had heard Larry Frasier make a comment about a neighbor girl, stating that she would be 'an easy target.'

CS# 1 later told Deputy McGaha that he/she believed Frasier was trying to 'straighten up his act' and didn't want to get involved any further. At the time of CS# 1's statements to Deputy McGaha and Deputy Taggart it is believed that CS# 1 and Frasier were having an argument. CS# 1 and Frasier were friends

prior to this and Deputy McGaha believes they are on friendly terms again. On October 31, 2000 I talked with Deputy John Collins who told me of a report he received a couple months ago from a concerned citizen, a person who wished to remain anonymous. (CS# 2) This person wished to remain anonymous because of fear of retaliation. CS# 2 told Deputy Collins that he/she had visited the Frasier residence about two months ago to pick up his/her children, who were visiting with the Frasier children. CS# 2 told Deputy Collins that while at the residence he/she saw a 'bale of marijuana' in the garage. CS# 2 could not remember for sure how long since this happened but it had been several months prior to reporting it.

On October 31, 2000, I received information from a person who wishes to remain anonymous. (CS# 3) This person said that he/she has been inside the Frasier residence within the past 72 hours and saw marijuana. CS# 3 said that Frasier sold marijuana and was growing marijuana in the garage. I found CS# 3 to be credible. CS# 3 expressed fear of retaliation and believes Frasier to be a violent person capable of causing physical harm. CS# 3 believes a person named Tony Cardwell is supplying Frasier with marijuana for resale.

On October 31, 2000 I interviewed a person who lives close to Larry Frasier. (CS# 4) This person wishes to remain anonymous because they live nearby and are afraid of retaliation by Frasier. This person stated he/she had been told that Frasier dealt in drugs and was growing marijuana in his garage. CS# 4 told me the name of the person who told him/her this and I found their source of information to be CS# 1 from above. CS# 4 believes this is probably true because CS# 4 has in the past seen a lot of traffic in and out at the resi-

dence. CS# 4 said he/she also believed it to be true because a few weeks ago Frasier obscured the windows on the garage so nobody can see inside. CS# 4 said it looked like Frasier had painted the glass windows. CS# 4 said that about 1 1/2 weeks ago they saw a person they knew as Tony Cardwell at the Frasier, [sic] outside the house, talking with Frasier. CS# 4 said Frasier had a gun and CS# 4 believed he/she witnessed a drug deal but couldn't articulate why he/she though [sic] that except that Frasier had a gun. CS# 4 also told me that his/her spouse was invited into the Frasier's residence by Larry Frasier. Frasier tried to show the spouse pornographic pictures on his computer by [sic] the spouse declined and said he/she didn't want to see them.

On November 1, 2000 I drove past the Frasier residence. It appears to me that the windows on the overhead garage door are covered or painted black. I saw a stack of black plastic pots behind the garage. I have seen this type of pots [sic] many times in the past, during other marijuana investigations, with marijuana plants in them. I viewed the residence with a thermal imager, a device that shows temperature differences between objects. The overhead door to the garage showed signs of higher temperature. What I saw is consistent with the heat pattern that would be present with an indoor marijuana grow where the lights used for the plants produce heat. I have been trained and certified in the use of a thermal imager and it's [sic] application during investigations of indoor marijuana grows.

I checked for criminal history for Larry Frasier through NCIC and found that Frasier was arrested by the Indiana State Police of the Evansville Post for

smuggling marijuana. This arrest was in 1978 and shows no disposition.

In my training and experience people who deal in illegal drugs keep records of transactions to show who owes money for drugs bought on credit. The records may be written or kept on a computer. It is also my experience that people who grow marijuana frequently take photographs or make videotape recordings of their marijuana plants. I have also learned in my training and experience that people who deal illegal drugs frequently keep the drugs in a safe, lockbox, or locked room in their residence to keep them secure from visitors and/or their children.

Based upon the above-described information, which I believe to be true, I believe evidence of possession of marijuana, dealing in marijuana, and/or child pornography is located in the residence of Larry Frasier. The residence is located at 6390 Oriole Drive, Brown County, Indiana. From the road the residence appears to be a one-story frame structure with attached garage.

I am requesting a Search Warrant be issued for the above-described residence, outbuildings, and premises. I am asking for authorization to search the residence as well as safes, lock boxes, locked rooms, computers, computer hard drives, computer disks or any other device used to store digital information, photographs, videocassette tapes, and photographic negatives.

I am asking for authorization to seize any evidence related to possession of marijuana, dealing marijuana, and/or

child pornography, including but not limited to: marijuana plants, processed marijuana, marijuana packaging materials and equipment, equipment used to grow marijuana, drug paraphernalia, notes and/or records related to the sale of marijuana, scales, safes and/or lock boxes used to store marijuana, and pornographic images depicting persons believed to be children." Appendix at 25–27.

Based upon this affidavit, Brown County Circuit Court Judge Judith A. Stewart issued a search warrant which directed the police to enter Frasier's home and garage and to search for and seize the following:

> "Marijuana plants, processed marijuana, marijuana packaging materials and equipment, equipment used to grow marijuana, drug paraphernalia, notes and/or records related to the sale of marijuana, scales, safes and/or lock boxes used to store marijuana...."[1] *Id.* at 28.

On November 1, 2001, Detective Southerland and other officers executed the warrant. When Southerland entered the Frasier residence, he went to the bedroom where a personal computer was located. Southerland first noticed an icon labeled "Smoke" located on the computer's "desktop."[2] Upon opening this file to view it, Southerland discovered that it included a letter to a company which sold a product purporting to allow one to pass a urine drug screen. Southerland then began opening documents listed in the "Documents" sub-menu of the computer's "Start" menu. This sub-menu lists recent-

---

1. Following this line of text on the search warrant, the following words have been marked out by the issuing Judge, "and pornographic images depicting persons believed to be children." *Id.* at 28. Thus, the search warrant did not authorize the search and seizure of such.

2. This refers to the representation of a desktop used by many computer graphical user interfaces, not a physical desktop upon which the computer was itself located.

ly opened documents on the computer. The first document Southerland opened from this list contained an image of a young, nude female. Southerland believed that the image was evidence of child pornography and printed the image. He then opened "two or three more files," before he realized that the files listed in the "Documents" menu likely contained images. Transcript at 34. Southerland told another deputy what he had found and asked that deputy to seek a warrant to search for evidence of child pornography on the computer. Such a warrant was issued the following day.

On November 6, 2000, the State charged Frasier with one count of Possession of Marijuana as a Class D felony, one count of Possession of Marijuana as a Class A misdemeanor, and one count of Possession of Child Pornography as a Class A misdemeanor. On August 23, 2001, Frasier filed a motion to suppress the evidence seized as a result of the search of his house and computer. A hearing on this motion was held on February 21, 2002, and on May 12, 2002, the trial court entered an order denying[3] the motion. Frasier moved to certify the suppression issue for interlocutory appeal, which the trial court granted on May 31, 2002. *See* Ind. Appellate Rule 14(B)(1). This court accepted appellate jurisdiction of the appeal on August 26, 2002. *See* App. R. 14(B)(2).

# I

## *Validity of Search Warrant*

Frasier claims that the issuance of the search warrant was erroneous because it was not supported by probable cause.

"In deciding whether to issue a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.' *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The duty of the reviewing court is to determine whether the magistrate had a 'substantial basis' for concluding that probable cause existed. *Id.* at 238–39, 103 S.Ct. at 2332–33. '[S]ubstantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination' of probable cause. *Houser v. State*, 678 N.E.2d 95, 99 (Ind.1997). 'Reviewing court' for these purposes includes both the trial court ruling on a motion to suppress and an appellate court reviewing that decision. *Id.* at 98. In this review, we consider only the evidence presented to the issuing magistrate and not *post hac* justifications for the search. *Seltzer v. State*, 489 N.E.2d 939, 941 (Ind.1986)." *Jaggers v. State*, 687 N.E.2d 180, 181–82 (Ind.1997) (modification and italics in original).

*See also Bryant v. State*, 655 N.E.2d 103, 107 n. 6 (Ind.Ct.App.1995). Although we accord deference to the magistrate's probable cause determination, we review *de novo* the trial court's decision on a motion to suppress seized evidence. *Methene v. State*, 720 N.E.2d 384, 388 (Ind.Ct.App. 1999).

---

**3.** The trial court denied the motion to suppress with the exception of "any evidence derived or obtained from image files from the Defendant's computer opened and seized by law enforcement subsequent to the first file being opened which contained images the officers believed to be child pornography, and prior to issuance of the second search warrant." App. at 290.

## A. Thermal Imaging

■ Our review of probable cause in the present case is somewhat complicated by the use of thermal imaging by the police. As stated in the probable cause affidavit, Detective Southerland, without a warrant, used a thermal imaging device to detect an increase in temperature inside Frasier's garage. This was done on November 1, 2000. On June 11, 2001, the United States Supreme Court held that when the Government uses a device such as a thermal imager, which is not in general public use, to explore details of a home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant. *Kyllo v. United States*, 533 U.S. 27, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Thus, by the time of the suppression hearing held on February 21, 2002, Southerland's warrantless use of the thermal imager had been held to be constitutionally impermissible. The trial court dealt with this situation by not considering the information obtained by the use of the thermal imager in ruling on the motion to suppress. This is consistent with the holding of the *Kyllo* Court, which remanded the case to the District Court to determine whether, without the improperly obtained thermal imaging evidence, the search warrant in that case was supported by probable cause. *Id. See also Utley v. State*, 589 N.E.2d 232, 236 (Ind.1992) (once false information has been excised from the probable cause affidavit, court determines whether remaining portions are sufficient to establish probable cause), *cert. denied*, 506 U.S. 1058, 113 S.Ct. 991, 122 L.Ed.2d 142 (1993); *Bryant*, 655 N.E.2d at 109 (same). We will do likewise.

## B. Probable Cause

Frasier claims that the information supporting the search warrant is mostly unreliable hearsay obtained from anonymous sources. Frasier's argument is based upon the Fourth Amendment and Indiana Code § 35–33–5–2(b) (Burns Code Ed. Repl.1998),[4] which has codified changes in Fourth Amendment doctrine on the use of informants to establish probable cause. *Jaggers*, 687 N.E.2d at 183; *Methene*, 720 N.E.2d at 388.

In *Illinois v. Gates*, 462 U.S. 213, 227, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court, interpreting the Fourth Amendment, held that uncorroborated hearsay from a source whose credibility is itself unknown is insufficient by itself to support a finding of probable cause. *See also Jaggers*, 687 N.E.2d at 182. Such hearsay must exhibit some hallmarks of reliability. *Jaggers*, 687 N.E.2d at 182. Use of information received from anonymous informants presents heightened reliability concerns. *Id.* at 182. This "situation is rife with the potential for pranks and mischief." *Id.* at 182–83. Because of these concerns, some form of corroboration of the accusations is even more essential when the informant is anonymous. *Id.* at 183.

■ Frasier claims that the hearsay contained in Southerland's affidavit failed to meet the standards for reliability set forth in I.C. § 35–33–5–2(b) and *Gates*. The State responds by claiming that the informants mentioned in the affidavit are not "anonymous" simply because their names are not set forth in the affidavit. Rather, the State claims that each informant was a "concerned citizen" who simply desired to remain anonymous out of fear of

---

**4.** With regard to the sufficiency of the affidavit, Frasier makes no argument regarding Article 1, Section 11 of the Indiana Constitution.

retaliation and that it is reasonable to infer that the police knew the identity of the informants. Information gleaned from cooperative citizens who are either eyewitnesses or victims of a crime may be relied upon in determining whether probable cause exists for a search where there are no circumstances which call the informant's motives into question. *Bryant,* 655 N.E.2d at 108; *Pawloski v. State,* 269 Ind. 350, 354–55, 380 N.E.2d 1230, 1232–33 (1978). *See also Gates,* 462 U.S. at 233–34, 103 S.Ct. 2317 ("if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary").

■ Frasier also complains that the information in the affidavit is stale. "It is a fundamental principle of search and seizure law that the information given to the magistrate or judge in the application for a search warrant must be timely." *Breitweiser v. State,* 704 N.E.2d 496, 499 (Ind. Ct.App.1999) (citing *Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932)). Stale information gives rise to a mere suspicion and not a reasonable belief, especially when the items to be obtained in a search are easily concealed and moved. *Raymer v. State,* 482 N.E.2d 253, 255 (Ind. 1985). Although the age of the information supporting an application for a warrant can be a critical factor when determining the existence of probable cause, our courts have not established a bright-line rule regarding the amount of time which may elapse between obtaining the facts upon which the search warrant is based and the issuance of the warrant. *Breitweiser,* 704 N.E.2d at 499. Instead, whether the information is tainted by staleness must be determined by the facts and circumstances of each particular case. *Id.*

■ In the present case, there are legitimate questions regarding whether the issuing magistrate had enough information to determine whether the informants were truly anonymous or merely citizen informants. It also appears that it is difficult if not impossible to tell the age of much of the information in the affidavit. Regardless, it is not necessary for us to determine whether Southerland's affidavit was sufficient to establish probable cause, for even if we assume that it was insufficient, the evidence which Frasier seeks to suppress would be admissible under the "good faith" exception to the exclusionary rule.

## II

### *Good Faith Exception*

Generally, when evidence is obtained in violation of the Fourth Amendment, such evidence may not be used against a defendant at trial. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). There are certain exceptions and limitations to this general principle. Among them is the "good faith" exception set forth in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). As explained by the *Leon* Court, the exclusionary rule does not require the suppression of evidence obtained in reliance upon a defective search warrant if the police relied upon such a warrant in objective good faith. 468 U.S. at 922–23, 104 S.Ct. 3405. *See also Jaggers,* 687 N.E.2d at 184.

The good faith exception has been codified in Indiana Code § 35–37–4–5(a) (Burns Code Ed. Repl.1998), which states, "In a prosecution for a crime or a proceeding to enforce an ordinance or a statute defining an infraction, the court may not grant a motion to exclude evidence on the grounds that the search or seizure by which the evidence was obtained was unlawful if the evidence was obtained by a

law enforcement officer in good faith." Pursuant to I.C. § 35–37–4–5(b):

"evidence is obtained by a law enforcement officer in good faith if:

(1) it is obtained pursuant to:

(A) a search warrant that was properly issued upon a determination of probable cause by a neutral and detached magistrate, that is free from obvious defects other than nondeliberate errors made in its preparation, and that was reasonably believed by the law enforcement officer to be valid; or

(B) a state statute, judicial precedent, or court rule that is later declared unconstitutional or otherwise invalidated; and

(2) the law enforcement officer, at the time he obtains the evidence, has satisfied applicable minimum basic training requirements established by rules adopted by the law enforcement training board under IC 5–2–1–9."

There are in turn certain exceptions to the good faith exception. As stated in *Leon,* the good faith exception is not applicable in situations where (1) the magistrate is misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) the issuing magistrate wholly abandoned his judicial role; (3) the warrant was based upon an affidavit so lacking in indicia of probable

cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient, i.e., in failing to particularize the place to be searched or the things to be seized, that the executing police officers cannot reasonably presume it to be valid. 468 U.S. at 923, 104 S.Ct. 3405. Although we should be careful not to equate the reasonableness of the officer's belief with the establishment of probable cause in the affidavit, it is equally critical that we do not construe the good faith exception so broadly as to obliterate the exclusionary rule. *Figert v. State,* 686 N.E.2d 827, 832 (Ind. 1997).

■ In the case at bar, the State claims, and we agree, that even if the search warrant was unsupported by probable cause, the police acted in good faith in relying thereon and the evidence need not be excluded at trial. Frasier insists that there are reasons that the good faith exception should not apply. Frasier does not argue that the magistrate was misled by information in an affidavit that Detective Southerland knew was false or would have known was false except for his reckless disregard for the truth.[5] Frasier's main argument is that the warrant was based upon an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.[6] Frasier also claims that the use of the

---

**5.** Frasier does note that Southerland "neglected to inform" the magistrate that the plastic pots which he had observed at Frasier's residence and which were similar to those he had seen in the past with marijuana in them "were also related to run of the mill gardening." Appellant's Brief at 18. He does not, however, allege that any of the information in the affidavit was false.

**6.** It might be observed that the *Leon* good faith exception is inapplicable when the officer executing the warrant is the same officer

who knowingly or intentionally provided false or misleading information to the issuing magistrate. In such instance it cannot be said that the executing officer is acting in "good faith." *See Everroad v. State,* 570 N.E.2d 38, 57 (Ind.Ct.App.1991) (Sullivan, J., concurring in part and dissenting in part), *superseded by Everroad v. State,* 590 N.E.2d 567 (Ind.1992) (holding that search warrant was fatally tainted and without probable cause and therefore not discussing, except by implication, the issue of a *Leon* good faith exception).

thermal imaging device, although constitutionally permissible at the time, has since been held to be illegal, and therefore, the police should not have been allowed to benefit from the such use.

Whether or not Southerland's affidavit was sufficient to establish probable cause, it was not so deficient as to render reliance thereon entirely unreasonable. In *Jaggers*, our Supreme Court wrote:

"Law enforcement officers are trained to distinguish the incriminating from the innocuous.... Because the informant in this case was anonymous, it would have been clear at the outset to a reasonable police officer that some corroboration of the caller's allegations would be critical if a warrant was to be obtained. Indeed, our decisions have emphasized that corroboration of inculpating information can sometimes be crucial to determining the existence of good faith." 687 N.E.2d at 185.

The *Jaggers* court determined that the good faith exception did not apply because in that case, in addition to somewhat misleading information contained in the affidavit, the police investigation was limited to confirming factual allegations which shed no light on whether Jaggers's house contained evidence of a crime. *Id.*

■ As noted, there is no indication here that Southerland provided misleading or false information to the magistrate. Indeed, Southerland even included information in the affidavit which was not favorable to a finding of probable cause, such as the fact that C.S.1 and Frasier had been arguing. Moreover, Southerland's investigation did, to a certain extent, corroborate the information from the informants. Although the warrantless use of the thermal

imager has since been held unconstitutional, we believe it relevant to the existence of Southerland's good faith at the time the warrant was executed. *See Illinois v. Krull*, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (good faith exception applicable where officer's reliance upon constitutionality of statute authorizing search was objectively reasonable despite the fact that the statute was later held to be unconstitutional); *State v. Ward*, 231 Wis.2d 723, 604 N.W.2d 517 (2000) (good faith exception applicable where police action was based upon judicial precedent allowing no-knock entries although court simultaneously overruled that precedent).

The information gathered from the thermal imaging device, combined with the otherwise relatively innocuous facts that Frasier had plastic planting pots behind his garage and had covered up the windows on his garage door, do lend credence to the information the police had received that Frasier was growing marijuana in his garage. Therefore, we hold that, at the time the warrant was executed, it was not based upon an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. In short, the good faith exception to the exclusionary rule is applicable to the present situation, and the trial court did not err in denying Frasier's motion to suppress with regard to evidence obtained as a result of this warrant.[7]

## III

### *Images on Frasier's Computer*

Frasier contends that images discovered during a search of his personal computer may not properly be entered into evidence

---

7. Frasier argues that the good faith exception embodied in I.C. § 35–37–4–5(b)(1)(B) is inapplicable because there was no statute, precedent, or court rule which authorized the use of the thermal imager. Be that as it may, it is the good faith exception contained in Section 5(b)(1)(A) which is applicable here.

against him. The warrant issued on November 1, 2001, did not authorize the police to search Frasier's computer for child pornography as Southerland had requested. The warrant did nevertheless authorize the police to search Frasier's computer for notes and records related to the sale of marijuana. In the process of executing the warrant, the police discovered pornographic images of what appeared to be children on Frasier's computer. In several respects Frasier challenges the admissibility of these images.

## B. Plain View Doctrine

◼ The State and Frasier differ as to whether the images on Frasier's computer are admissible under the "plain view" doctrine. Under the plain view doctrine, police may seize evidence not identified in a warrant when a police officer inadvertently discovers items of readily apparent criminality while rightfully occupying a particular location. *Jones v. State*, 783 N.E.2d 1132, 1137 (Ind.2003). For the plain view doctrine to be applicable, (1) the initial intrusion must have been authorized under the Fourth Amendment, (2) the items must be in plain view, and (3) the incriminating nature of the evidence must be immediately apparent. *Id.*

### 1. Initial Police Intrusion

◼ Although Frasier's argument focuses mainly upon the second of these requirements, we must also determine whether the first requirement has been met. We have not decided whether the search warrant was supported by probable cause. Such a decision might seem necessary to determine whether the initial police intrusion was authorized. However, we have held that the *Leon* good faith rule does not require exclusion of the evidence even if it was seized in violation of the

Fourth Amendment. The question before us is whether the good faith of the police in reliance upon a search warrant, even if it is later determined to be not supported by probable cause, is sufficient to satisfy the first requirement of the plain view doctrine. We conclude that it is. To hold otherwise would lead to the somewhat incongruous result that evidence seized in good-faith reliance upon a search warrant later held to be invalid would be admissible, but that evidence seen in plain view by the officers executing that warrant would not be.

A similar result was reached in *United States v. Legg*, 18 F.3d 240 (4th Cir.1994), *cert. denied*, 512 U.S. 1244, 114 S.Ct. 2761, 129 L.Ed.2d 876, wherein the court held that good faith reliance upon a warrant was sufficient to permit application of the plain view doctrine. The *Legg* court wrote, "because the deputies possessed an objectively reasonable belief that the warrant was valid, they were lawfully present in Legg's apartment during execution of the warrant." *Id.* at 244. The *Legg* court further noted:

> "We recognize that an officer's reasonable good faith belief in the validity of a warrant does not cause his presence in an individual's home to be any less violative of the Fourth Amendment.... Nonetheless, we conclude that the rationale of *Leon* should apply to render an officer lawfully present for purposes of applying the plain view doctrine as long as the officer possesses a reasonable good faith belief in the validity of the warrant and the warrant was issued by a detached and neutral magistrate."[8] *Id.* at n. 2 (citations omitted).

*See also United States v. Morris*, 904 F.2d 518 (9th Cir.1990) (holding that plain view

---

**8.** The same result was reached by the Seventh Circuit Court of Appeals in the unpublished case of *Kykta v. Washington*, 107 F.3d 873 (table), 1997 WL 58860 (7th Cir. Feb.5, 1997).

requirement that there be a prior justification for the officer's presence was met by search warrant, and that even assuming that warrant was invalid, good faith exception was applicable to permit admission of the evidence).

### 2. Inadvertence

■ Frasier claims that the images were not inadvertently discovered. We recognize that inadvertence is no longer an indispensable element of the plain view doctrine as far as federal Fourth Amendment analysis is concerned. *See Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Neville v. State*, 663 N.E.2d 169, 173 n. 3 (Ind.Ct.App.1996); *Wood v. State*, 592 N.E.2d 740, 742 (Ind. Ct.App.1992). Nevertheless, the inadvertence requirement still has application with respect to Article 1, Section 11 of the Indiana Constitution. *Parker v. State*, 662 N.E.2d 994, 1000 (Ind.Ct.App.1996) ("We have previously noted that in order to be admissible under a 'plain view' theory, the discovery of the contraband must be inadvertent.") (Sullivan, J., dissenting), *trans. denied*. *See also Warner v. State*, 773 N.E.2d 239, 245 (Ind.2002) (plain view doctrine applicable when police are not searching for evidence against accused, but nonetheless inadvertently come across incriminating object).

Frasier contends that the discovery of the images on his computer was not inadvertent in that "it is undisputed that Southerland expected to find illegal pornography on the computer." Appellant's Br. at 34. Frasier bases this claim upon the fact that Southerland had originally sought authorization from the magistrate to search Frasier's computer for child pornography. Although the warrant authorized Southerland to search Frasier's computer for evidence relating to marijuana, Frasier claims that Southerland's true intention all along was to search the computer for child pornography, and that Southerland's claim that he was looking for records relating to marijuana was simply a pretext.

■ Frasier insists that Southerland's testimony was incredible and could not be relied upon by the trial court. It is well settled that, upon review of motions to suppress, we will neither reweigh evidence nor judge the credibility of witnesses. *Allen v. State*, 743 N.E.2d 1222, 1227 (Ind.Ct. App.2001), *trans. denied*. Frasier's claim relies upon *Clark v. State*, 173 Ind.App. 295, 297, 363 N.E.2d 1045, 1047 (1977), for the proposition that an appellate court is not bound to accept testimony of a witness which is incredible. While that may be an accurate statement, it begs the question and misapplies the holding of *Clark*. In that case the court held that since the testimony of the State's witnesses was not incredible, it was required to accept the trial court's assessment of their credibility. Here, Southerland indicated at the suppression hearing that he was unaware that the first image file he opened was an image file before he opened it. Southerland had previously indicated that he was aware that it was an image file and that he was looking for images that might relate to marijuana. This testimony, although inconsistent, is not so incredibly dubious or inherently improbable that it runs counter to human experience. *Cf. Heeter v. State*, 661 N.E.2d 612, 615 (Ind.Ct.App.1996). The trial court was within its discretion as the trier of fact to accept Southerland's testimony as true.

Southerland testified that while executing what he believed to be a valid search warrant, he opened a file on Frasier's computer and discovered that it contained an image which appeared to be child pornography. Southerland further testified that he came across this file by accessing the "Documents" sub-menu of the "Start"

menu, which contains a list of recently opened files on the computer. Although his testimony was inconsistent with his prior statements, Southerland stated that he did not know that the first image file he opened was an image file until after he opened it.

Frasier has not established that Southerland's discovery of this image was not inadvertent. The position advocated by Frasier would render the plain view doctrine inapplicable any time an officer, while executing a search warrant for certain items, discovered in plain view items for which he had unsuccessfully sought a search warrant. We reject such a narrow interpretation of the inadvertence requirement.

### 3. Whether Images were in Plain View

■ Frasier's main point of contention regarding the applicability of the plain view doctrine is that the images discovered by Southerland were not in "plain view." Specifically, Frasier claims that the closed image files on his computer were not in plain view and the police were without authority to open them; only after the files had been improperly opened, Frasier claims, did their contents come into view. Frasier contends that police should not open computer files when searching a computer for information, but instead should use less intrusive means such as a text-based search or inspecting a file without viewing its contents. According to Frasier, "Police could determine details about a file, such as its type (picture, text etc), its size, the location it is saved, without opening it, but not its exact contents." Appellant's Br. at 27.

In support of his claim, Frasier cites *Smith v. State,* 713 N.E.2d 338 (Ind.Ct. App.1999), *trans. denied.* In *Smith,* Indiana State Police troopers obtained Smith's consent to search his car for guns,

drugs, money, or contraband. During the search, one of the troopers took Smith's cellular phone, and used a "short-out" technique to access the contents of the computer memory of the phone. Upon appeal, this court held that while the seizure of the phone itself was within the scope of the consent given by Smith, i.e. to search for guns, drugs, money, or contraband, "any further action in accessing the computer memory of the phone to retrieve its electronic contents was invalid and exceeded the scope of Smith's consent to search." *Id.* at 343. In so holding, the *Smith* court noted that information, like other intangible items, may be seized within the meaning of the Fourth Amendment. *Id.* at 343–44. The court also held that the plain view doctrine did not allow admission of the information obtained from the phone's memory. *Id.* at 345. The court, focusing upon the requirement that the criminal nature of the evidence be "immediately apparent" held that the mere possession of a cellular phone does not establish the basis for probable cause to believe that the possessor has committed any crime. *Id.*

Frasier claims that the holding in *Smith* was based upon the fact that the phone's memory had to be accessed to determine its contents. In other words, because possession of the phone itself did not give rise to any reasonable suspicion or probable cause to believe that a crime had been committed, the police had no right to further delve into the contents of the phone without consent. Thus, Frasier argues that the images found on his computer were like the computer memory in *Smith* and not in plain view.

The present situation, however, is rather different from that present in *Smith.* Here, the police were executing what they believed to be a valid search warrant which authorized their search of the con-

tents of Frasier's computer for notes or records related to the sale of marijuana.[9] Thus, unlike the troopers in *Smith*, Southerland believed that he had authority to search the contents of the computer's hard drive and disks. His apparent authority was not limited in the same manner as that of the troopers in *Smith*, who had obtained consent to look only for guns, drugs, money, and contraband. Had the warrant in our case authorized the police to search only for marijuana, and the police accessed the data contained on Frasier's computer, the situation would be similar to that in *Smith*. Instead Southerland believed he was authorized to access the data on Frasier's computer to search for marijuana records and happened across images believed to be child pornography.

Frasier's citation to *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir.1971) is also unavailing. In *Dichiarinte*, federal agents obtained the defendant's consent to search his house for narcotics. While conducting this search, the agents opened and read some of the defendant's personal papers, which were later used to convict him for tax evasion. The court held that the agents went beyond what was necessary to determine whether the defendant had hidden narcotics among his personal papers and read through those papers to determine whether they indicated any criminal activity. *Id.* at 130. The court further held that such acts violated the Fourth Amendment and suppressed the evidence. *Id.* at 131. In addressing the government's argument that the items were in plain view, the court said that the tax records were not in plain view, but had to

be opened and read. *Id.* Frasier claims that, like the tax records in *Dichiarinte*, the images found on his computer had to be opened and read. However, the key difference between *Dichiarinte* and our case is that there, the police were authorized by the consent to search only for narcotics, not documents. Here, Southerland, in objective good faith, was executing a search warrant for computer records regarding the sale of marijuana and was looking for such when he came across the image files. Unlike the agents in *Dichiarinte*, Southerland was searching in a place where the computer documents for which the search was authorized were likely to be located. *See United States v. Rudolph*, 970 F.2d 467 (8th Cir.1992) (distinguishing *Dichiarinte* from that case in that the officer searched in a place likely to contain the objects for which consent to search was given), *cert. denied*, 506 U.S. 1069, 113 S.Ct. 1023, 122 L.Ed.2d 169 (1993).

Frasier also cites to *United States v. Carey*, 172 F.3d 1268 (10th Cir.1999), *reh'g denied*. The situation in *Carey* was similar to the one before us: the police had a warrant to search the defendant's computer for documentary evidence pertaining to the sale and distribution of controlled substances. *Id.* at 1270. While searching the computer for such information, a police officer noticed numerous files with sexually suggestive names which ended in the suffix ".jpg".[10] After a search of text-based files proved unfruitful, the officer encountered files he was unable to view on the computer he was using. Therefore he copied the files to another computer where he was

---

9. Frasier briefly contends in a footnote that any search of the computer was improper. However, he develops this argument no further, and we will not consider it upon appeal.

10. This file name extension indicates that the file was an image compressed in the "JPEG"

format. JPEG, a standardized mechanism for image compression, stands for Joint Photographic Experts Group, the original name of the group that defined the standard. *See* http://www.faqs.org/faqs/jpeg-faq/part1/ (last visited July 23, 2003).

readily able to view a JPEG file which, upon opening for viewing, was discovered to contain child pornography. The officer proceeded to copy approximately. 244 JPEG files, many of which also contained pornographic images of children. Carey filed a motion to suppress the JPEG files, which the District Court denied.

Upon appeal to the Tenth Circuit, Carey argued that the search was a general rummaging in "flagrant disregard" for the warrant and in violation of the Fourth Amendment, because the warrant was very specific in what types of files could be seized. 172 F.3d at 1272. The United States argued that the files were admissible under the plain view doctrine. Specifically, the Government argued:

> "'a computer search such as the one undertaken in this case is tantamount to looking for documents in a file cabinet, pursuant to a valid search warrant, and instead finding child pornography.' Just as if officers ha[d] seized pornographic photographs from a file cabinet, seizure of the pornographic computer images was permissible because officers had a valid warrant, the pornographic images were in plain view, and the incriminating nature was readily apparent as the photographs depicted children under the age of twelve engaged in sexual acts. The warrant authorized the officer to search any file because 'any file might well have contained information relating to drug crimes and the fact that some files might have appeared to have been

graphics files would not necessarily preclude them from containing such information.'" *Id.* (citation omitted).

The Tenth Circuit, however, held that the plain view exception did not apply because, after viewing the first JPEG file, the executing officer's suspicion changed, and he had probable cause to believe the remaining JPEG files contained pornography. The court wrote:

> "it is plainly evident that each time he opened a subsequent JPG file, [the officer] expected to find child pornography and not material related to drugs. Armed with this knowledge, he still continued to open every JPG file to confirm his expectations. Under these circumstances, we cannot say the contents of each of those files were inadvertently discovered." *Id.* at 1273.[11]

The *Carey* court then held that the plain view exception did not apply. *Id.* The court then stated:

> "Although the question of what constitutes 'plain view' in the context of computer files is intriguing and appears to be an issue of first impression for this court, and many others, *we do not need to reach it here.* Judging this case only by its own facts, we conclude that the items seized were not authorized by the warrant. *Further, they were in closed files and thus not in plain view.*" *Id.* (emphasis supplied).

---

**11.** The *Carey* decision might be read in this regard as an attempt to resurrect the "inadvertence" requirement earlier discarded by the U.S. Supreme Court in *Horton v. California, supra.* On the other hand, use of the word "inadvertently" in *Carey* may merely be recognition of the principle enunciated in *Horton* that although inadvertence is not a "necessary condition" it nevertheless is a "characteristic of most legitimate 'plain-view' seizures." 496 U.S. at 130, 110 S.Ct. 2301.

Be that as it may, we are not here applying an inadvertence factor with regard to a federal Fourth Amendment analysis. Rather we are applying the inadvertence requirement pursuant to constitutional analysis under Article 1, Section 11 of the Indiana Constitution. The *Carey* case, therefore, provides useful guidance.

Frasier seizes upon the last sentence of this paragraph and maintains that no closed file can be in plain view because it must be "opened" by a program to be viewed. However, immediately before stating this, the *Carey* court clarified that it would not reach the issue of what constitutes plain view in the context of computer files. Thus, we must consider this language as obiter dictum; the essential holding of the *Carey* court was that the plain view exception was inapplicable because the officer expected to find the files.

This view is further supported by the *Carey* court's own limitation of its holding contained in a footnote to the opinion. The court stated that, given the executing officer's inadvertent discovery of the first JPEG file during his search for documents relating to drug activity, its holding was limited to the "subsequent opening of numerous files the officer knew, or at least expected, would contain images of child pornography." *Id.* at n. 4. Thus, the first image inadvertently opened by the officer was admissible pursuant to the plain view doctrine. Yet this image was also closed when the officer first stumbled across it while looking for other documents. Therefore, according to the *Carey* court, the fact that the document was closed cannot be the touchstone of whether the plain view doctrine is applicable; rather, it is whether the discovery was inadvertent.

As discussed above, Frasier's claim that the discovery of the first image file on his computer was advertent is simply an invitation for us to reweigh evidence and assess witness credibility. Southerland testified that he was unaware of what type of file he was opening when he first found an image containing suspected child pornography. Applying the logic of the *Carey* decision, this file was in plain view. As to the remaining files opened after it was learned that the first one contained pornography, we approach a situation similar to that in *Carey*, where the officer expected to find more child pornography when he opened the subsequent files. However, unlike the other images in *Carey*, which apparently were labeled with sexually suggestive titles, the subsequent files opened by Southerland were cryptically named. Only after a few such files were opened, and all contained pornographic images, did Southerland expect the rest of the files to likewise be pornographic. At this point, Southerland sought and received a search warrant before continuing the search—precisely what the officer in *Carey* failed to do.

This is to be compared with the situation in *Carey*, where the court explicitly noted that:

"[t]his is not a case in which ambiguously labeled files were contained in the hard drive directory. It is not a case in which the officers had to open each file drawer before discovering its contents. Even if we employ the file cabinet theory, the testimony of Detective Lewis makes the analogy inapposite because he stated he knew, or at least had probable cause to know, each drawer was properly labeled and its contents were clearly described in the label." *Id.* at 1275.

The case before us *is* a case in which ambiguously labeled files were located on the hard drive and the officer had to "open" each file before discovering its contents.[12]

We have our own concerns with the approach advocated by Frasier and suggested by the *Carey* court, which implies that the police must rely upon the label given to a file to determine its contents. A

12. We also note that after receiving the second search warrant, Southerland continued to search for documents relating to the sale of marijuana.

computer image file is not exactly the same as a physical photograph. An officer searching for physical documents relating to drugs can come across a photograph and see its contents without having to "open" the photograph. The situation with a computer image file containing a photograph is somewhat different. The image file must be "opened," i.e., read and interpreted by some program in order to render its contents into a humanly perceptible form, i.e., an image on the computer monitor.[13] In this sense, a computer image file is akin to a photograph sealed in an envelope or folder. And the name given to the file is like a label stuck onto the envelope or folder. Although such a label might say "Tax Records," the photograph inside could be of a nude child. Likewise, a computer image file containing child pornography could easily be named "tax_records.xls," in an attempt to hide its actual contents. The approach suggested by Frasier would require the police to rely upon the name and file extension given to a file in order to determine its contents. As many have unfortunately found by way of email viruses, such identification methods are not always secure; a malicious executable program might easily be named "picture.jpg.exe" and appear to be a harmless image file. An officer searching for one type of record on a computer should not be forced to rely upon the name given to a file, which might very well hide its actual contents. In order to find out what is contained in the file, it must necessarily be "opened" in some way to ascertain its contents. The only sure way for Southerland to determine what was contained in any file on Frasier's computer, and whether this file was to be seized pursuant to the warrant, was for him to "open" it.[14]

Because the image files found on Frasier's computer were inadvertently discovered in plain view while Southerland was executing a search warrant which he objectively believed to be valid, the plain view exception is applicable. Based upon these images, the police obtained a second search warrant which authorized a search for child pornography. Even if we follow the reasoning of the *Carey* court, and that of the trial court in the present case, at the very least the first image file opened by Southerland was inadvertent, and this was enough by itself to establish probable cause to support a warrant to search the rest of Frasier's computer for child pornography.

### C. Reasonableness

Lastly, Frasier claims that the search of his computer was unreasonable under both the Fourth Amendment and Article 1, Section 11 of the Indiana Constitution. However, we have already determined that without regard to an inadvertence requirement, the search was valid under the Fourth Amendment pursuant to the plain view doctrine. We also conclude that it was reasonable under the Indiana Constitution. Southerland inadvertently came across image files of what appeared to be child pornography while executing a search warrant which he objectively believed to be valid authorizing the search of computer records relating to the sale of marijuana. Given the totality of the circumstances, we decline to say that Southerland's actions were constitutionally unreasonable.

### Conclusion

We need not determine whether the first search warrant was supported by

---

13. Indeed, even to render a name and icon for the file, the computer operating system must, to a certain extent, read the file.

14. For an explanation of an alternate approach see Raphael Winick, *Searches & Seizures of Computers & Computer Data*, 8 HARV. J.L. & TECH. 75, 102–111 (1994).

probable cause; regardless, the evidence seized pursuant thereto is admissible under the good faith exception to the exclusionary rule. The images discovered on Frasier's computer during a search for records relating to the sale of marijuana, but prior to the issuance of the second search warrant are admissible under the plain view doctrine. The search of Frasier's computer was not unreasonable.

The order of the trial court is affirmed, and the cause is remanded for proceedings not inconsistent with this opinion.

BAKER, J., concurs.

DARDEN, J., dissents with opinion.

DARDEN, Judge, dissenting.

I must respectfully dissent from the majority's holding that the good faith exception to the exclusionary rule applies to the State's seizure of marijuana pursuant to a search warrant issued upon Detective Scott Southerland's probable cause affidavit. The probable cause affidavit is permeated with hearsay upon hearsay, self-serving conclusory statements lacking in indicia of reliability, and little, if any, information to establish the credibility of the confidential sources. As such, I would reverse the trial court's ruling and find that the good faith exception does not apply because the probable cause affidavit is so lacking in indicia of reliability that it strains credulity and renders official belief in its existence unreasonable. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

Similar to my dissent in *State v. Johnson*, 669 N.E.2d 411 (Ind.Ct.App.1996), *trans. denied*, I do not believe that the facts in this case support a finding that Detective Southerland acted in good faith. Indiana Code § 35–33–5–2(b) provides that an affidavit for probable cause may be based on hearsay if it: (1) contains reliable information concerning the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or (2) contains information that establishes that the totality of the circumstances corroborates the hearsay. Because the provisions of this statute were not satisfied, it cannot be said that Detective Southerland acted in good faith. *See Baldwin v. Reagan*, 715 N.E.2d 332 n. 5 (Ind.1999) (where our supreme court refused to presume that law enforcement officers will break the law, implying a presumption that law enforcement officers will follow the law).

In his affidavit, Detective Southerland stated that 90 days before the probable cause affidavit was filed (approximately August 1, 2000), he spoke with Deputies McGaha and Taggart. It was Deputy McGaha who informed him of confidential source # 1's allegations about Frasier possessing and growing marijuana in his garage. At no time did Detective Southerland speak with confidential source # 1 to determine his/her credibility. In addition, no action was taken and more than three months elapsed before a search warrant was sought. As a result, it would seem that either the officers did not find confidential source # 1 to be reliable or that they knew the information provided was insufficient to constitute probable cause. Detective Southerland suggested as much when he implied that a recent argument between Frasier and confidential source # 1 may have been the reason he/she had made the instant allegations.

Next, Detective Southerland stated in the affidavit that he spoke with Deputy Collins on October 31, 2000. Apparently, Deputy Collins told Detective Southerland that two months earlier (approximately August 1, 2000) he had been told by confidential source # 2 that he/she had seen a

bale of marijuana in Frasier's garage. However, confidential source # 2 could not remember the date of the alleged sighting because he/she had *waited several months* before approaching Deputy Collins. Again, Deputy Collins' delay in taking any action strongly suggests that the allegations were either stale, or did not constitute sufficient probable cause to obtain a search warrant. And again, Detective Southerland never spoke with confidential source # 2, and no facts are included in the affidavit to establish credibility or to corroborate the information.

Finally, on October 31, 2000, Detective Southerland stated that he interviewed confidential sources # 3 and # 4. Confidential source # 3 alleged that within the past 72 hours he/she had seen marijuana inside Frasier's home. Then, Detective Southerland, without any supporting facts mentioned in the record, summarily concluded that he found confidential source # 3 to be credible. Confidential source # 4 stated that confidential source # 1 had told him/her that Frasier was dealing marijuana, had obscured the windows of his garage, and that he/she thought they saw Frasier involved in a drug transaction because he was standing in his yard talking to an individual. Detective Southerland stated that confidential source # 4 believed these allegations to be true because he/she had seen a lot of traffic in and out of Frasier's residence. Again, no facts are included to establish the credibility of the allegations made by these sources, or to establish what he/she meant by "a lot of traffic."

Unlike the extensive independent investigation conducted by the police in *Leon,* the only independent investigation conducted by Detective Southerland, outside of the unconstitutional search using a thermal imaging device, was (1) driving by Frasier's residence to confirm that the garage windows had been painted; (2) ob-serving a stack of black plastic planting pots behind Frasier's garage; and (3) a criminal history check. None of these observations alone or together would constitute probable cause supporting the issuance of a search warrant. Moreover, I do not believe that, when combined with the uncorroborated allegations of these confidential sources, there is probable cause to support a search warrant. However, there was ample information to justify an investigation. But, what is most troubling is that the police, who claim to be "trained and experienced," would be allowed to use the uncorroborated allegations of sources as probable cause to obtain a search warrant for a person's home. There is *nothing* in the probable cause affidavit from which a trial court, let alone Detective Southerland, could reliably determine the " 'veracity' " and " 'basis of knowledge' " of the sources that supplied the hearsay information. *See Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

The good faith exception to the exclusionary rule is just that, an exception, which should not be routinely used to subvert the requirements for obtaining a proper search warrant based upon reasonable probable cause. Where the probable cause affidavit for the issuance of a search warrant is so lacking in indicia of reliability and probable cause, as in this case, it calls into question whether the police officer's reliance upon it was unreasonable as well as whether the issuing magistrate or judge was neutral and detached or had wholly abandoned their judicial role.

*Johnson,* 669 N.E.2d at 415 (Darden, C., *dissenting*) (citation omitted).

I would reverse the trial court.